# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39583**

————————————

**UNITED STATES**
*Appellee*

v.

**Norbert A. KING II**
Lieutenant Colonel (O-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 16 August 2021

————————————

*Military Judge:* J. Wesley Moore (arraignment and motions); Steven J. Grocki (motions); Shaun S. Speranza.

*Approved sentence:* Dismissal and confinement for 3 years. Sentence adjudged 1 August 2018 by GCM convened at Joint Base McGuire-Dix-Lakehurst, New Jersey, and Trenton Federal Courthouse, New Jersey.

*For Appellant:* Mark C. Bruegger, Esquire; Tami L. Mitchell, Esquire; David P. Sheldon, Esquire.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, LEWIS, and CADOTTE, *Appellate Military Judges*.

Senior Judge LEWIS delivered the opinion of the court, in which Chief Judge JOHNSON and Judge CADOTTE joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

LEWIS, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of sexual assault of his biological daughter, JK, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920, and one specification of committing an act of sexual penetration upon a blood relative, JK, a non-capital offense in violation of Title 2C, Chapter 14, Section 2, Subsection (c)(3)(a) of the New Jersey Code of Criminal Justice, as assimilated into federal law under Article 134, UCMJ, 10 U.S.C. § 934.[1] The court members sentenced Appellant to a dismissal and three years of confinement. The convening authority deferred the mandatory forfeitures of pay and allowances until action. At action, the convening authority approved the adjudged sentence and waived the mandatory forfeitures for six months and directed they be paid to JK. Appellant had requested the forfeitures be paid to his spouse, SK, for her benefit and the benefit of his other three minor children.

Appellant raised 14 issues through counsel, which we have reworded and reordered: (1) whether the record of trial is incomplete as two court rulings are missing; (2) whether the military judge erroneously denied an unreasonable multiplication of charges motion;[2] (3) whether a reservist military judge erred by not recusing himself because of his civilian employment with the United States Department of Justice; (4) whether the court-martial was improperly constituted; (5) whether the evidence is legally and factually insufficient; (6) whether the military judge erred in admitting prior consistent statements of JK; (7) whether trial defense counsel provided ineffective assistance of counsel on multiple grounds; (8) whether the military judge erred in allowing JK to reference improper victim impact evidence in her Rule for Courts-Martial (R.C.M.) 1001A unsworn statement; (9) whether the mandatory dismissal is unconstitutional; (10) whether the Government's unauthorized enrollment of Appellant's family and friends in the Victim Witness Assistance Program (VWAP) represents cruel and unusual punishment or warrants sentence appropriateness relief; (11) whether the convening authority improperly directed that the waived mandatory forfeitures be paid to JK rather than to Appellant's wife, SK, and their three minor children; (12) whether the Government's prohibition against Appellant having contact with his minor children during post-trial confinement violated his constitutional rights and warrants sentence relief; (13) whether the Government's refusal to provide Appellant with his pre-

---

[1] All references in this opinion to the UCMJ, Rules for Courts-Martial (R.C.M), and Military Rules of Evidence are found in the *Manual for Courts-Martial, United States* (2016 ed.).

[2] This is one of the missing rulings from the first assignment of error.

scribed medications during post-trial confinement represents cruel and unusual punishment or warrants sentence relief; and (14) whether the cumulative effect of the errors substantially impaired the fairness of Appellant's trial.

Appellant personally raises three issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (15) whether his sentence is inappropriately severe; (16) whether the military judge erred in denying two illegal pretrial punishment motions; and (17) whether additional sentence relief is warranted due to Appellant's transfer from the Naval Consolidated Brig in Miramar, California, to the Naval Consolidated Brig in Charleston, South Carolina, which effectively precluded Appellant from visiting with his family and continuing his rehabilitation.

We also consider facially unreasonable appellate delay as this opinion was released more than 18 months after docketing.

We combine assignments of error (1) and (2) as one of the two missing rulings involves an unreasonable multiplication of charges motion that Appellant asserts was erroneously denied, if it was decided. On this combined issue, we conclude the record of trial contains a substantial omission because it is missing the military judge's ruling on whether there was an unreasonable multiplication of charges for findings. As the Government has failed to rebut the presumption of prejudice from this substantial omission, we remedy this error by setting aside the findings of guilt to the Article 134, UCMJ, offense, Charge II and its Specification, and dismissing them with prejudice. We also reassess the sentence later in the opinion.

Regarding assignment of error (9), we find the mandatory dismissal is constitutional for the reasons we announced in *United States v. Rita*, 80 M.J. 559, 561–62 (A.F. Ct. Crim. App 17 Jul. 2020), *rev. denied*, 80 M.J. 363 (C.A.A.F. 2020).

We combine assignments of error (10), (12), and (13) as each involves post-trial confinement conditions.

After considering issues (15), (16), and (17) as raised personally by Appellant, we find they warrant no further discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Regarding assignment of error (14), we considered whether the principle of cumulative error warrants reversal of Appellant's approved sentence. *See United States v. Gray*, 51 M.J. 1, 61 (C.A.A.F. 1999) (explaining the implied premise of the cumulative error doctrine is that errors, in combination, necessitate disapproval of a finding or sentence and that assertions of error without merit are not sufficient to invoke the doctrine). While we find error in three areas—missing rulings, showing good cause on the record for a court member

excusal, and erroneous enrollment of defense witnesses in the VWAP program—we do not find sentence relief is warranted even when these errors are considered cumulatively. Therefore we affirm the remaining findings to Charge I and its Specification, and the sentence, as reassessed.

## I. BACKGROUND

JK was 17 years old and living at home at the time of the events that led to Appellant's court-martial. On the evening of 10 September 2016, Appellant and JK were watching movies in the living room of Appellant's house on Joint Base McGuire-Dix-Lakehurst (JBMDL), New Jersey. The rest of the family was upstairs, either sleeping or trying to sleep. This included Appellant's wife SK (JK's stepmother) and the three biological minor children of Appellant and SK (JK's younger half-brothers and half-sister).

While watching the movies, JK requested Appellant massage her calf muscle as it was tight and causing her pain. Appellant agreed and proceeded to massage her calf, then moved to massage JK's upper thigh. Appellant generally agreed that these events occurred.

According to JK, the massage became invasive when Appellant wanted to massage the area where her muscle connected to her pelvic bone. Appellant asked "if this was okay" and JK agreed it was. Appellant then reached beneath JK's underwear line and rubbed her vaginal area rather than her pelvic bone. Appellant did not digitally penetrate JK's vagina. Soon after, Appellant took off JK's "pants"[3] and underwear. According to JK, Appellant used his mouth and tongue to "orally stimulate [her] vaginal region" and he "partially" penetrated her vagina with his mouth.[4] JK felt that this lasted for around 30 seconds before she pushed Appellant off her and put her "underwear and pants" back on. Appellant asked JK whether he "should go tell mommy?" JK did not respond. As JK did not want Appellant to touch her again, she went upstairs to her bedroom, leaving her cell phone behind. Once upstairs, JK used her computer to message her best friend ND nine times in a two-minute span. At trial, photographs of ND's cell phone show these messages were between 0047 and 0049 hours. The messages showed that JK was leaving for ND's house—also on JBMDL—because she needed help. Having sent the nine messages to ND, JK departed her house on foot. Once outside, JK thought she saw Appellant on

---

[3] JK later explained in her testimony that she was wearing shorts during the massage and that Appellant removed them. JK clarified that she used the word "pants" to describe jeans and shorts.

[4] Both charged offenses involved penetration of JK's vulva with Appellant's mouth. Appellant was not charged with an offense for touching the outside of JK's vagina.

one of the sidewalks so she used a trail that went through the woods to avoid him.

Despite JK's messages, ND was still asleep when JK arrived. JK started knocking on the back door to try and wake up ND as her bedroom was on the first floor. ND's parents were still awake upstairs and upon hearing the knocking, one of them called 911 to report a possible break-in. JBMDL security forces responded and found a visibly distraught JK at ND's back door. JK was brought inside the house and comforted by ND and ND's mother while security forces personnel attempted to determine why JK had run away from her house in the middle of the night. At first, JK was uncomfortable disclosing what happened to her so she spoke in hypotheticals. One of the hypotheticals was about a daughter and her father where a massage led to sexual advances by the father. As JK grew more comfortable, she disclosed her name to the security forces personnel and clarified that Appellant was the father in the hypothetical and she was the daughter.

JK's disclosure required notification of the on-call special agent (SA) from the Air Force Office of Special Investigations (AFOSI). AFOSI agents responded to ND's house and transported JK to the detachment, located on JBMDL. The agents conducted a video-recorded interview of JK beginning at about 0500 hours. Portions of the audio of this interview were admitted as rebuttal evidence as prior consistent statements of JK.

After JK's interview with AFOSI, she agreed to go to the hospital and undergo a sexual assault forensic examination (SAFE). JK had urinated, but not showered, prior to the SAFE. The sexual assault nurse examiner (SANE) wrote down a narrative from JK in the SAFE report which was also admitted into evidence. The narrative is largely consistent with JK's AFOSI interview and testimony. The SANE collected the underwear JK wore before and after the assault and obtained external genital swabs and buccal swabs from JK for later DNA testing.

At about 0900 hours on 11 September 2016, Appellant was interviewed by AFOSI agents after being advised that he was suspected of violating Article 120b, UCMJ, for "sexual assault of a child."[5] Appellant waived his rights under Article 31, UCMJ, 10 U.S.C. § 831, and agreed to answer questions. Appellant's interview was video-recorded and large portions of it were admitted into evidence as a prosecution exhibit.

---

[5] As JK had attained the age of 16 years old, she was not a "child" as defined by 10 U.S.C. § 920b(h)(4).

After Appellant and the agents discussed some preliminary matters, Appellant described watching movies with JK as follows:

> Went downstairs. I got her[6] a drink. Mommy came down. We started a movie, Bad Boys. Then mommy went to bed. We watched Bad Boys—[JK] and I watched Bad Boys. And then—so this is that—okay, and then we started the second movie. About halfway through the movie she said she's going upstairs, she'll be right back. Went upstairs. She's in the bathroom. She didn't come back down.

Appellant then described seeing a "creepy guy" outside his house and that he "took a quick drive around the block" and followed the creepy guy, then went back home and went upstairs where he thought JK "was in the bathroom still" and he went to bed.

Appellant omitted any mention of a massage of JK in his initial narrative to AFOSI. In response, the agents disclosed to Appellant that JK had been interviewed and one of the agents, SA JB, asked Appellant more direct questions:

> [SA JB]: Did you massage her legs at all yesterday?
>
> [Appellant]: Yeah. Yeah.
>
> [SA JB]: When did that happen?
>
> [Appellant]: Ah, during the week, she usually -- she'd throw her leg up on top of me, ask me to massage her legs. So I massage her calf. She said her quads were hurting. Told her to go get the [foam roller].[7] Where it was and then just showed her how to do that. Well, that's not the first time. I've showed her how to do that several times.

Eventually, Appellant admitted that he massaged JK's leg while watching one of the movies, but he denied taking off her pants. He also offered a few theories on why JK was making false claims against him. Most prominent was Appellant's theory that JK's biological mother was behind it. Appellant told the agents that he had full custody of JK and there was a restraining order

---

[6] Appellant did not explain whether the "her" was JK or SK. It was not disputed that Appellant gave JK white wine to drink during the evening. The amount of wine JK consumed was contested.

[7] The record indicates in a parenthetical that Appellant "gestured with his right hand a rolling motion under his right thigh."

against JK's biological mother because "she does things like this quite frequently."[8] The agents responded by telling Appellant that JK had told them "a little bit about her back story" with JK's biological mother and her stepfather and how JK came to live with Appellant.[9]

The agents questioned Appellant further about the massage:

> [SA JB]: Okay. So [what's] being told to us is basically, after you massaged her leg, you took her pants off and you performed oral sex on her. And then she pushed you away. And when you tried to ----
>
> [Appellant]: So, no. So when -- whenever I massage her leg I ask her, are you okay? Is this fine? [Because] we ran into a situation before, [JK] told a friend that I touched her inappropriately. I'm like, oh, my gosh, [JK, your] history,[10] you can't do that. It's -- then I'm not going to massage you anymore. When I told her I wasn't going to touch her, and then she got all weird about it. And I said, no, no more massaging. Nothing. You don't touch me. I don't touch you. That went on for a good -- I want to say six, seven months. And then she started asking me again, and then…
>
> [SA JB]: Yeah, she said that you asked her if it was okay when you were massaging her leg. And she said yeah, that's fine. And she said when you went to take her pants off, she kind of zoned out. And you know, she----
>
> [Appellant]: Well that didn't happen. Well, that's not…

---

[8] At this point in the interview, Appellant did not explain what he meant. Later in the interview, Appellant mentioned a claim by JK's biological mother that he "threw her down and started beating her." Appellant denied wrongdoing but asserted that JK knew about the complaint her biological mother had made and the result was a police report for which he "had to go to court."

[9] There was limited testimony before the court members which explained the "back story" of JK, her biological mother, and an incident with JK's stepfather. During JK's cross-examination, JK was asked by Appellant's civilian defense counsel, "But you knew that you had made a prior allegation against your stepfather that resulted in, [an] investigation, prosecution and guilty plea, right?" JK answered "correct." ND's mother also testified one of the hypotheticals JK used was "that there was this young girl was with her mom" and "her mom's boyfriend inappropriately touched her and then she moved in with her dad." Appellant's father testified that JK was about nine years old when she began living with Appellant. Additional details regarding the incident with JK and her stepfather remain sealed in the record of trial.

[10] Appellant appears to be referencing the incident with JK and her stepfather.

[SA JB]: She said you performed oral sex on her for about 30 seconds or so. She----

[Appellant]: I'm trying to think what movie we watched. So the Bad Boys. And then we were watching Bad Boys II.

[SA JB]: She said she pushed you away. And then you said, "Should I tell mommy," and then she got freaked out and ran upstairs, and left her phone down there.

[Appellant]: So [SK] found the phone on the couch. So if that makes sense. But none of that stuff happened.

Later in the interview, SA JB asked Appellant about the earlier time JK told a friend that Appellant touched her inappropriately. Appellant denied knowing the specifics of what JK told her friend but agreed that allegation was "the whole massage thing again" and it was "along the lines of I touched her inappropriately." The questioning continued:

[SA JB]: Okay. And why did you continue to massage her after this had happened?

[Appellant]: I totally stopped it, like and I told her that [because] she always asked me [to] massage her calves . . . I should have just not ever massage[d] her again, obviously. But just something my mom -- we used to do the same thing for me whenever my calves hurt, or my back, or my legs. She used to do the same thing. She's a nurse. I did it for my mom. I know [SK] thinks it weird. Like, we massaged each other, but...

[SA JB]: [SK] thinks what's weird?

[Appellant]: That [JK] massages my back and then I massage, like, her back. And she's like this -- [is] weird, I'm no, my mom does it to me all the time.

By the end of the interview, Appellant posited several additional theories for why JK was making a false claim against him. The additional theories included: (1) JK was not allowed to go to prom; (2) Appellant yelled at JK for her driving earlier in the day; (3) Appellant did not allow her to have a boyfriend; (4) Appellant checked JK's messages with a boy, CH; and (5) Appellant's opinion that JK might have several mental health conditions. Appellant conceded that his massages of JK now seemed "creepy" to him, but he did not think about this at the time because it was his daughter and it was for "medicinal purposes." He then stated that JK was smart, that this was not the first time Appellant massaged her and that is why SK is "always saying it's weird" and he "just never thought of it like that, like the sexual aspect of it." Appellant agreed

to provide a DNA sample at the end of the interview. Appellant did not undergo a SAFE.

While Appellant was being interviewed, AFOSI agents searched the house with SK's consent and photographed the downstairs living room and a bottle of white wine in the kitchen. JK returned during this search and showed the agents the computer she used to send messages to her friend ND. The agents did not collect any biological evidence from the house.

Later forensic testing by the United States Army Criminal Investigation Laboratory (USACIL) found no male DNA on the external genital swabs from JK's SAFE. At trial, the USACIL DNA examiner testified that she received eight external genital swabs, rather than the normal two, and the collection of eight swabs could have diluted any DNA that was present. The DNA examiner also explained that it could have been that "no male DNA [was present] to begin with." The DNA examiner also testified that she received a swab from Appellant's "outer mouth area" and "there was nothing foreign to him on that sample."

The forensic testing results of JK's underwear showed that male DNA was found on the "inside crotch area and inside front panel." Y-chromosome short tandem repeat (Y-STR) testing of the "inside front panel" of JK's underwear was "inconclusive due to degraded and/or insufficient amount of male DNA present in the sample." Regarding the "inside crotch area" of JK's underwear, Appellant and his paternal male relatives could not be excluded from the Y-STR testing results.[11]

## II. DISCUSSION

### A. Incomplete Record and Unreasonable Multiplication of Charges

#### 1. Additional Background

Appellant asserts the record of trial is incomplete because it is missing two military judge rulings on defense motions, one of which alleged an unreasonable multiplication of charges (UMC) for findings. Appellant argues that we

---

[11] USACIL generated Y-STR statistics based on the "probability of randomly selecting a male individual with this profile from the same population group as [Appellant], given that it has already been observed." The Defense's forensic DNA expert testified at trial that the closest calculation for a population group for Appellant was 1 in 1,335 individuals, "a relatively low match statistic, meaning that many individuals in the random population could have that same profile and also all male relatives" of Appellant.

must set aside the findings and sentence because we cannot fulfill our statutory obligation to review the findings and sentence without the missing rulings. We agree with Appellant but only for the missing UMC ruling.

Regarding the missing UMC ruling, Appellant alternatively argues that assuming *arguendo* that the military judge denied the motion for purposes of findings, that decision was erroneous. Appellant argues his conduct was "united in time, circumstance, and impulse" as to constitute one offense for findings. *See, e.g., United States v. Hernandez*, 78 M.J. 643 (C.G. Ct. Crim. App. 2018); *United States v. Clarke*, 74 M.J. 627 (A. Ct. Crim. App. 2015). Both of the cases Appellant cites involved separately charged assaults under Article 128, UCMJ, 10 U.S.C. § 928. Given our resolution of the incomplete record issue due to the missing UMC ruling, we find this alternative argument moot.

### a. Motion to Dismiss for Unreasonable Multiplication of Charges

The first missing ruling involved a defense motion to dismiss for UMC. The written motion and the Government's response are appellate exhibits in the record of trial. The first military judge who presided over Appellant's court-martial—Judge Moore—heard arguments from the parties on this motion. Those arguments are transcribed in the record of trial. Before recessing the court-martial, Judge Moore stated his intent to issue written rulings on the motions that were argued. Judge Moore did not reserve an appellate exhibit for his UMC ruling.

At the next session of Appellant's court-martial, about two months later, the second military judge, Judge Grocki, presided. A number of rulings by Judge Moore were marked as appellate exhibits, but the UMC motion ruling was not among them. Judge Grocki discussed a few pending motions but did not specifically identify the UMC motion. However, at a later point, the Defense referenced the UMC motion and how Judge Moore ruled on it. Specifically, the Defense told Judge Grocki about the motion for an "unreasonable multiplication of similar charges" and that the Defense "filed a motion on that previously. We were denied. So I'm not going to relitigate that issue." Appellant does not allege that Judge Moore failed to rule on the UMC motion entirely, just that "no such ruling can be found in the record."

The third military judge, Judge Speranza—who presided over findings and sentencing—decided *sua sponte* to merge both charges and specifications for purposes of sentencing once findings were announced and Appellant was convicted of both offenses. Judge Moore's earlier UMC ruling was not mentioned.

### b. Motion for Appropriate Relief – Illegal Pretrial Punishment

The second missing ruling was on a Defense motion for appropriate relief for illegal pretrial punishment under Article 13, UCMJ, 10 U.S.C. § 813.[12] This motion addressed restrictions that were placed on Appellant during the investigation and trial that limited when he could access his house and have contact with his three minor children. Judge Grocki received evidence and heard argument on this motion. The motion, response, and transcribed argument on the motion are all contained in the record of trial. Judge Grocki did not rule on the record and did not reserve an appellate exhibit for a written ruling.

At the next session of court, three months later, Judge Speranza presided. He summarized an R.C.M. 802 conference he held with the parties and stated there were no outstanding rulings. At this session, several rulings made by Judge Grocki were marked as appellate exhibits, but this illegal pretrial punishment ruling was not one of them.

After Appellant was convicted, Judge Speranza inquired whether Appellant was subjected to illegal pretrial punishment. The Defense responded that "[t]he issue was already previously raised." Judge Speranza asked if it was resolved and whether there was a ruling and the Defense responded, "There was a ruling, yes sir." The trial counsel agreed. Judge Speranza then noted, "It is one of the rulings I know that we marked in our initial session, I believe." Judge Speranza was incorrect as this illegal pretrial punishment ruling was never marked as an appellate exhibit. Therefore it was not attached to the record of trial.

On appeal, the Government filed a motion to attach an affidavit from the assistant trial counsel and a five-page ruling dated 30 April 2018 from Judge Grocki on this illegal pretrial punishment motion. The ruling does not bear a signature, digital or wet, but does contain Judge Grocki's signature block with "//s//" above it. Other written rulings by Judge Grocki in the record of trial contain an identical "//s//" above his signature block. The assistant trial counsel declared that the five-page ruling is a true and accurate copy of the ruling provided to the parties, to the best of his recollection. We granted the motion to attach over Appellant's objection.[13] In his reply brief, Appellant argues that we should have required the Government to utilize R.C.M. 1112(d)(2) to correct

---

[12] The Defense filed two motions addressing illegal pretrial punishment. The first motion filed on this issue was ruled upon and that ruling is contained in the record of trial. This assignment of error relates only to the second illegal pretrial punishment motion.

[13] We understand that we are permitted to consider declarations from outside the record of trial when necessary to resolve issues raised by materials in the record of trial. *See United States v. Jessie*, 79 M.J. 437, 442–44 (C.A.A.F. 2020).

the record of trial, and the Defense should have been allowed to review this ruling under that rule.

**2. Law**

A complete record of the proceedings, including all exhibits, must be prepared for any general court-martial that results in death, dismissal, a discharge, or (if the sentence adjudged does not include a discharge) any other punishment which exceeds that which may otherwise be adjudged by a special court-martial. Article 54(c)(1)(A), UCMJ, 10 U.S.C. § 854(c)(1)(A); R.C.M. 1103(b)(2)(D)(v). Whether a record of trial is complete is a question of law we review de novo. *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2014) (citation omitted).

"[A] substantial omission renders a record of trial incomplete and raises a presumption of prejudice that the government must rebut." *United States v. Harrow,* 62 M.J. 649, 654 (A.F. Ct. Crim. App. 2006) (citation omitted), *aff'd*, 65 M.J. 190 (C.A.A.F. 2007). However, "[i]nsubstantial omissions from a record of trial do not raise a presumption of prejudice or affect that record's characterization as a complete one." *United States v. Henry,* 53 M.J. 108, 111 (C.A.A.F. 2000) (holding that four missing prosecution exhibits were insubstantial omissions when other exhibits of similar sexually explicit material were included). We must approach the question of what constitutes a substantial omission on a case-by-case basis. *United States v. Abrams,* 50 M.J. 361, 363 (C.A.A.F. 1999) (citation omitted).

Article 54, UCMJ, and R.C.M. 1103 do "not limit the court of criminal appeals' [ ] discretion to remedy an error in compiling a complete record." *United States v. Gaskins*, 72 M.J. 225, 230 (C.A.A.F 2013). Only in the cases where "a verbatim transcript cannot be prepared" are the remedial options "limited and definitively circumscribed." *Davenport*, 73 M.J. at 378.

**3. Analysis**

The Government argues both missing rulings are insubstantial omissions as they did not have an impact on the sufficiency of the Government's evidence on the merits.[14] We disagree. In our view, the correct approach is to determine whether the missing rulings affected "an appellant's rights at trial." *United States v. Hill*, No. ACM 38648, 2015 CCA LEXIS 308, at *10 (A.F. Ct. Crim.

---

[14] The Government favorably cites *United States v. Bennett*, No. ARMY 20121072, 2016 CCA LEXIS 418, at *34 (A. Ct. Crim. App. 30 Jun. 2016), *aff'd*, 76 M.J. 337 (C.A.A.F. 2017), and *United States v. Singletery*, No. ARMY 20140686, 2016 CCA LEXIS 390, at *7 (A. Ct. Crim. App. 16 Jun. 2016). While both cases involved missing rulings of a military judge, we find both cases distinguishable and therefore unpersuasive.

App. 29 Jul. 2015) (unpub. op.) (citing *Abrams,* 50 M.J. at 364; *United States v. Gray*, 7 M.J. 296, 298 (C.M.A. 1979)).

We evaluated the omission of each of the missing rulings and conclude that each one affected Appellant's rights at trial. Specifically, the UMC motion implicated "those features of military law that increase the potential for over-reaching in the exercise of prosecutorial discretion" and "dismissal of . . . charges is a remedy available" to the military judge to address UMC for findings. *See United States v. Campbell*, 71 M.J. 19, 22–23 (C.A.A.F. 2012) (quoting *United States v. Roderick*, 62 M.J. 425, 433 (C.A.A.F. 2006); *United States v. Quiroz*, 55 M.J. 334, 337 (C.A.A.F. 2001)). Additionally, R.C.M. 307(c)(4) instructs "[w]hat is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person" and R.C.M. 906(b)(12)(i) addresses that the appropriate remedy "shall be dismissal of the lesser offense or merger of the offenses into one specification" if the military judge, in his or her discretion, finds UMC for findings. We conclude that once the issue of UMC for findings was properly raised by written motion, the military judge's decision on that issue, while discretionary, affected Appellant's rights at trial and ultimately allowed the court members to convict Appellant of both offenses. Turning to the denial of the illegal pretrial punishment motion, we conclude it also affected Appellant's rights at trial because the issue was properly raised by written motion and the military judge's decision resulted in Appellant receiving no credit against his adjudged confinement sentence of three years. As each ruling affected Appellant's rights at trial, we conclude that each missing ruling is a substantial omission. Therefore, a presumption of prejudice exists which the Government bears the burden of rebutting.

The Government identifies three points when Appellant could have been prejudiced by a missing ruling: (1) at trial, if the Defense had requested reconsideration on the military judge's ruling; (2) during clemency; and (3) on appeal. Applying the Government's first point to this case, we note that both missing rulings were issued prior to trial on the merits, the Defense either received or had access to the rulings for use during trial, and the Defense never requested reconsideration during trial. Therefore, we will focus our prejudice analysis on the clemency process and appeal. *See United States v. Underhill*, NMCCA 200700144, 2007 CCA LEXIS 306, at *8–9 (N.M. Ct. Crim. App. 9 Aug. 2007) (unpub. op.) (observing the convening authority's action and appellate review are the two primary points in the post-trial process where prejudice could result from a record of trial with substantial omissions).

### a. Unreasonable Multiplication of Charges

In his clemency submission, Appellant did not specifically allege legal error[15] by Judge Moore's apparent denial of the UMC ruling and did not mention the ruling was omitted from the record. Therefore, the staff judge advocate and convening authority were not called upon to review the specifics of the ruling and were not alerted that it was missing from the record. Additionally, the convening authority could not have modified the findings in this case under the applicable version of Article 60(c)(3), UCMJ, 10 U.S.C. § 860(c)(3), even if the merits of the UMC motion were raised. Under these circumstances, we conclude the Government has rebutted the presumption of prejudice as it applies to clemency for the missing UMC ruling.

On appeal, we reach a different conclusion and find the Government failed to rebut the presumption of prejudice. The Government has not moved to attach the missing UMC ruling and instead asks our court to conduct a de novo review of the legal issue. We decline the Government's request. We note that there is a question of fact raised by the UMC motion, and the Government has not shown how this factual dispute was resolved by Judge Moore. As we explain below, this is insufficient for the Government to rebut the presumption of prejudice.

The Defense's UMC motion listed three paragraphs of facts, including that the Government had, at the Article 32 preliminary hearing, stated that the specifications were charged "in the alternative" and "based on exigencies of proof." The Government's written response to the UMC motion was that it was "without knowledge" of the Defense's assertion that the specifications were charged in the alternative. We note that the Article 32 preliminary hearing officer's report specifically states, "Both allegations were charged in the alternative based on exigencies of proof, which the government confirmed during the hearing."

If the record contained Judge Moore's ruling, we would know whether and how this factual dispute was resolved, relevant to deciding if there is evidence of prosecutorial overreaching. *See Quiroz*, 55 M.J. at 338. The Government has not attempted to demonstrate that it changed its mind regarding exigencies of proof between the Article 32 preliminary hearing and the trial. Nor has it provided us any explanation of its motion response denying knowledge of a specific

---

[15] Appellant's military defense counsel asked the convening authority to "consider any and all objections and motions" made. We find this broad statement insufficient to raise a specific claim of legal error in the UMC ruling or that the record was incomplete. *See* R.C.M. 1107(b)(1) ("The convening authority is not required to review the case for legal errors or factual sufficiency.").

matter that was documented in the Article 32 report by the preliminary hearing officer. These are the type of questions that the Government must endeavor to answer to rebut a presumption of prejudice on appeal when it fails to produce a complete record of trial. We recognize our fact-finding authority under Article 66, UCMJ, 10 U.S.C. § 866, but decline to use it in this situation as the Government bears the burden of rebutting prejudice. We also note the Government has not requested we order a post-trial hearing under *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967). Nor has it requested that we remand the case so a certificate of correction can be obtained. Presumably, if the Government had located a copy of Judge Moore's missing ruling, it would have filed a motion to attach along with a suitable declaration, just as it did with the other missing ruling in this case.

We acknowledge that Appellant has been able to raise an assignment of error that the denial of the UMC motion was erroneous. This provides some support to the Government's argument that the presumption of prejudice has been rebutted. However, that assignment of error does not address the factual issue described above regarding exigencies of proof. We see this as an important matter to our review under Article 66, UCMJ. *See Quiroz*, 55 M.J. at 339 (describing Article 66(c), UCMJ, powers applicable to UMC as a determination of law under a classic legal test—whether the action under review was "reasonable" or "unreasonable"). Additionally, the assignment of error and answer do not reveal knowledge of the breadth or depth of Judge Moore's ruling, matters we see as important to whether the Government can rebut the presumption of prejudice. Under these circumstances, we find the Government has not rebutted the presumption of prejudice on appeal for the missing UMC ruling. We remedy this error by setting aside Charge II and its Specification and dismissing Charge II and its Specification with prejudice. We will conduct a sentence reassessment after addressing the remainder of the assignments of error.

Given our resolution of the above issue, we find Appellant's alternative argument—that his conduct was "united in time, circumstance, and impulse" as to constitute one offense and an unreasonable multiplication of charges for findings—to be moot.

### b. Illegal Pretrial Punishment Motion

We conclude the Government has rebutted the presumption of prejudice during clemency and on appeal for the missing ruling on this illegal pretrial punishment motion.

In his clemency submission, Appellant did not specifically allege legal error in Judge Grocki's ruling or note its omission from the record of trial. Therefore,

the staff judge advocate and convening authority were not called upon to review the specifics of the ruling or its omission during the clemency process. Under these circumstances, we conclude the Government has rebutted the presumption of prejudice as it applies to clemency.

The Government has also rebutted the presumption of prejudice on appeal. We granted the Government's motion to attach Judge Grocki's ruling and the declaration of the assistant trial counsel. We understand this to mean that we can consider the written ruling in deciding whether the Government has rebutted the presumption of prejudice on appeal. To be clear, we are not holding that the record of trial is now complete with Judge Grocki's ruling added as an appellate exhibit. If the Government sought to make the record of trial complete, it should have requested our court order a certificate of correction. We considered doing so on our own, but decline to do as we can resolve the presumption of prejudice issue without a certificate of correction. After reviewing the written ruling of Judge Grocki, we see no reason to question its authenticity or accuracy. We are satisfied that there are no impediments to our performance of our Article 66, UCMJ, responsibilities[16] or Appellant's ability to challenge this ruling regarding illegal pretrial punishment. The Government has rebutted the presumption of prejudice for this substantial omission from the record of trial.

## B. Military Judge Recusal

### 1. Additional Background

Appellant argues that Judge Grocki, an Air Force reservist, erred by refusing to recuse himself when, at the time of Appellant's trial, he was employed in his civilian capacity by the United States Department of Justice (DoJ) as a prosecutor for sex crimes against children. Appellant preserved this issue at trial.

Judge Grocki presided over some of the motions sessions and voir dire of the initial group of court members. He assembled the court with five members before granting a defense continuance motion. When court resumed months later, Judge Speranza presided over the remainder of the trial including the seating of replacement court members, findings, and sentencing proceedings.

Judge Grocki permitted the Defense an extensive opportunity to voir dire him regarding his civilian employment, his military justice career and experience, and various professional presentations he had given. The record is well

---

[16] We also considered the assistant trial counsel's declaration and Judge Grocki's ruling before we resolved issue (16) without further discussion or relief earlier in our opinion.

developed that at the time of the recusal motion Judge Grocki's civilian employment was as supervisor of the Child Exploitation and Obscenity Section for the Criminal Division of the DoJ. Judge Grocki had been employed by the DoJ for 13 years and in several positions within this section. The record also contains Judge Grocki's military justice background as an active duty judge advocate and reserve judge advocate, including military justice assignments as an area defense counsel, circuit trial counsel, appellate government counsel, and military judge. Several appellate exhibits show presentations that Judge Grocki made in his civilian capacity at various professional forums including his involvement in the We Protect Global Alliance, an international organization focused on preventing child sexual abuse, child pornography, prostitution, and human trafficking. The record also contains a presentation that Judge Grocki made before the Judicial Proceedings Panel[17] comparing the military justice system to the federal judicial system.

The Defense moved for Judge Grocki to recuse himself arguing that a reasonable member of the public would question his impartiality given his civilian employment. Judge Grocki denied the motion. In ruling, Judge Grocki highlighted (1) the extensive voir dire he allowed which he estimated lasted between an hour and a half to two hours; (2) that he had no personal knowledge or involvement with Appellant's case; (3) that in his civilian job he had not prosecuted a case since the spring of 2009 and that his responsibilities were "personnel," "policy and legislation far more . . . than litigation;" (4) his prior active duty assignment as an area defense counsel; (5) his ethical obligations under his state bar license when performing his judicial role as a reservist; and (6) his DoJ role in closing cases and dismissing charges were conducted to ensure the fair administration of justice. In explaining his reservist military judge role, Judge Grocki noted that his responsibilities are "very different and distinct" from his civilian role at the DoJ; he characterized this as "a bright line distinction." Judge Grocki noted that he had presided over cases involving child pornography and had never found his civilian position in the DoJ or his work history to require recusal. Judge Grocki cited R.C.M. 902(a) and applicable caselaw in denying the recusal motion.

**2. Law**

We review a military judge's decision not to recuse himself for an abuse of discretion. *United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015). "A military judge's ruling constitutes an abuse of discretion if it is 'arbitrary, fanciful,

---

[17] *See e.g.*, National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 576(a)(2) (2 Jan. 2013) (requiring the Secretary of Defense to establish a panel to conduct an independent review and assessment of judicial proceedings of adult sexual assault and related offenses).

clearly unreasonable or clearly erroneous.'" *Id.* at 453 (quoting *United States v. Brown*, 72 M.J. 359, 362 (C.A.A.F. 2013)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (citing *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

"[T]he validity of the military justice system and the integrity of the court-martial process 'depend[ ] on the impartiality of military judges in fact and in appearance.'" *United States v. Uribe*, 80 M.J. 442, 446 (C.A.A.F. 2021) (alteration in original) (quoting *Hasan v. Gross*, 71 M.J. 416, 419 (C.A.A.F. 2012) (per curiam)). "In the military context, the appearance of bias principle is derived from R.C.M. 902(a)." *Id.* (citation omitted). R.C.M. 902(a) states: "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *Sullivan*, 74 M.J. at 453 (citation omitted). "The appearance standard is designed to enhance public confidence in the integrity of the judicial system." *United States v. Quintanilla*, 56 M.J. 37, 45 (C.A.A.F. 2001) (citation omitted). "Although a military judge is to 'broadly construe' the grounds for challenge, he should not leave the case 'unnecessarily.'" *Sullivan*, 74 M.J. at 454 (quoting R.C.M. 902(d)(1), Discussion).

"[N]ot every judicial disqualification error requires reversal . . . ." *United States v. McIlwain*, 66 M.J. 312, 315 (C.A.A.F. 2008) (citation omitted). Appellate courts consider three factors to determine whether a disqualification error warrants a remedy: "(1) the risk of injustice to the parties[;] (2) the risk that denial of relief will produce injustice in other cases[;] and (3) the risk of undermining public confidence in the judicial process." *Id.* (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988)) (additional citations omitted).

### 3. Analysis

Judge Grocki was only challenged because his impartiality might reasonably be questioned. We find no abuse of discretion in his ruling. Judge Grocki cited and applied the correct law and his findings of fact regarding his civilian employment and work history are not clearly erroneous. Judge Grocki's application of the objective standard of impartiality was not clearly unreasonable, arbitrary, or fanciful.

Objectively, a reasonable person would have favorably viewed the extensive inquiry Judge Grocki allowed into his civilian employment, work history, and

professional presentations. Such a transparent approach ensured a thoroughly developed record for the public to observe during the trial and for us to review on appeal. We have considered the declarations made to our court from Appellant, his family, and his friends regarding their views of Judge Grocki. We recognize that the law does not view recusal subjectively through the eyes of those with a stake in the outcome of the proceeding. Rather, recusal is viewed through the eyes of a reasonable person who is detached from the outcome of the litigation but is concerned about public confidence in the judicial process to reach that outcome.

Judge Grocki thoroughly described his civilian and military roles and explained the distinction between those roles. This would have reduced the possibility of a reasonable person being confused about his separate roles in his DoJ civilian position and as a reserve military judge. Additionally, it would have been abundantly clear to a reasonable person that Appellant's investigation and court-martial did not intersect with the DoJ in any way. A reasonable person would notice that Judge Grocki had presided over Air Force cases with child pornography specifications despite his concurrent civilian role in the DoJ. A reasonable person would favorably consider Judge Grocki's significant experience in different roles in the military justice system, including as an area defense counsel and his specific disavowal of any actual bias. A reasonable person would find confidence in Judge Grocki's explanation about how seriously he took the issue of impartiality as a military judge and would recognize that it is common for reserve military judges to have civilian legal positions—including as prosecutors or defense counsel—that must be left behind when they put on their uniform and perform their military judicial duties.

On the whole, a reasonable person initially could have had some concern about Judge Grocki's civilian employment with DoJ and may have wanted to know more about it before deciding whether Judge Grocki's impartiality reasonably might be questioned. However, any initial concern about civilian employment or a desire for additional information would have been satisfied once all of the circumstances were revealed in an open and thorough fashion and Judge Grocki ruled on the recusal motion. We find no abuse of discretion in Judge Grocki's decision to not recuse himself.

Even if we assume *arguendo* that Judge Grocki abused his discretion by not recusing himself, in applying the three *Liljeberg* factors, we would not find reversal necessary to maintain public confidence in the judicial process. *See McIlwain*, 66 M.J. at 315 (citing *Liljeberg*, 486 U.S. at 864). First, we find the risk of injustice to the parties to be minimal. Judge Speranza actually presided over the findings and sentencing proceedings and Judge Grocki's rulings during motion practice show fair resolutions of the legal issues that were presented to him. While Appellant cites one comment made by Judge Grocki to

one trial defense counsel during one motion argument, we find this comment to be isolated and made in passing.[18] After the comment, Judge Grocki accurately summarized what the Defense requested on the motion and in our view fairly resolved the legal issue.

Second, we find the risk of injustice in other cases to be low. We expect that reserve military judges will have varying military justice assignments in their backgrounds and different civilian positions when selected and trained to be trial judges. We expect military judges to follow the established law on recusal and to invite the parties to question or challenge them on the record, which leaves little risk of injustice in other cases.

Third, we find the risk of undermining public confidence to be low. There is no inappropriate judicial behavior in this case and a different military judge actually presided over the merits of the case. While Judge Grocki made important rulings, the Defense had an opportunity to request reconsideration of any of those rulings once Judge Speranza was detailed. We conclude that a member of the public, fully informed of the circumstances, would believe that Appellant had a fair trial with a reliable result.

**C. Court Member Excusals**

**1. Additional Background**

In April 2018, after the court was assembled and voir dire completed, two full days of Appellant's five-day-docketed trial had been consumed and the Defense raised conflict concerns if the trial extended into the weekend. Judge Grocki expressed concern of being able to complete the findings phase of trial in the docketed timeframe. The Government noted that a defense expert consultant had to leave the next evening and opined that the findings would not be complete before this expert consultant had to depart. After this discussion, the Defense moved for a continuance which was granted until late July 2018. Subsequently, Judge Grocki brought in the court members as a group to discuss whether the continuance affected their availability to sit as court members. Various responses were obtained from the members, but the responses of Lieutenant Colonel (Lt Col) PBL and Lt Col KW are pertinent to this assignment of error.

Lt Col PBL told Judge Grocki about an upcoming assignment in June 2018 to a different organization on JBMDL. No further questioning was conducted of Lt Col PBL. Lt Col KW disclosed a selection for a Secretary of Defense fellowship from 1 July through 4 August 2018 in Washington, D.C., which would be followed by a permanent change of station (PCS) to an unknown location.

---

[18] We address this comment in the ineffective assistance of counsel assignment of error.

With all the members present, Judge Grocki instructed that they could only be released upon a showing of good cause by either the military judge or the convening authority.

After the continuance, on 24 July 2018 Appellant's trial resumed with Judge Speranza presiding and a new senior trial counsel as lead prosecutor. The Government announced all of the amendments to the convening orders including Special Order A-14, dated 21 June 2018, which is relevant to this assignment of error. Special Order A-14 was inserted into the record and it showed that Lt Col PBL and Lt Col KW were "relieved." After some preliminary matters, the newly detailed court members were sworn and questioned during voir dire. The Government mentioned three members were absent but still on the panel and then stated incorrectly, "The others were excused at an earlier session." Trial defense counsel said nothing even though Lt Col PBL and Lt Col KW had been excused by the convening authority and not by Judge Grocki at an earlier session of the court-martial.

In response to this assignment of error, the Government moved to attach a declaration of Colonel (Col) WA, the staff judge advocate to the general court-martial convening authority. Col WA's declaration includes several attachments which document the written excusal requests of Lt Col PBL, dated 14 June 2018, and Lt Col KW, dated 20 April 2018, as well as the staffing package showing the convening authority's decision to excuse both court members. We granted the motion to attach Col WA's declaration and the attachments over Appellant's objection. We understand that we are permitted to consider declarations from outside the record of trial when necessary to resolve issues raised by materials in the record of trial. *See United States v. Jessie*, 79 M.J. 437, 442–44 (C.A.A.F. 2020). This permits us to consider the declaration of Col WA and the attachments. Taken together, these documents show that Lt Col PBL was not reassigned to another unit on JBMDL but was selected for Air War College on 7 June 2018 and had a PCS to Maxwell Air Force Base, Alabama, not later than 18 July 2018. Turning to Lt Col KW's excusal request, we note that the request referenced the specifics of the Secretary of Defense fellowship in a substantially similar way to what was described on the record before Judge Grocki.

In his written advice to the general court-martial convening authority, Col WA, citing R.C.M. 505(c)(2), stated excusal after assembly may only be done for "good cause on the record." Col WA defined "good cause" consistent with R.C.M. 505(f) and explained that it does not include temporary inconveniences which are incident to normal conditions of military life. The general court-martial convening authority excused Lt Col PBL and Lt Col KW by initialing next to their names.

Before us, Appellant argues that no good cause was "shown on the record" for the excusals of Lt Col PBL and Lt Col KW. Appellant states the convening

authority "failed to provide *any* rationale, let alone good cause, for the excusals." Appellant claims the panel was not constituted in accordance with the UCMJ or Rules for Courts-Martial and that the court-martial lacked jurisdiction to try him. In his reply brief, Appellant argues the excusals were "without notice, opportunity to object, or establishing 'good cause' on the record," and this deprived Appellant of his "due process rights to be tried by the panel that had been assembled in April 2018."

The Government argues that the process of excusal is not a jurisdictional issue and that Appellant's failure to object to the excusal process during trial means we should review for plain error and find none.

**2. Law**

Article 29(a), UCMJ, 10 U.S.C. § 829(a), reads

> No member of a general or special court-martial may be absent or excused after the court has been assembled for the trial of the accused unless excused as a result of a challenge, excused by the military judge for physical disability or other good cause, or excused by order of the convening authority for good cause.

R.C.M. 505(c)(2)(A) states, "After assembly no member may be excused, except: (i) By the convening authority for good cause shown on the record; (ii) By the military judge for good cause shown on the record; or (iii) As a result of a challenge under R.C.M. 912."

When preserved by objection, we review a convening authority's decision to excuse a court member for good cause, after assembly, for an abuse of discretion. This is the same standard we use when reviewing a military judge's decision to excuse a court member for good cause, after assembly. *United States v. Lizana*, No. ACM 39280, 2018 CCA LEXIS 348, at *11 (A.F. Ct. Crim. App. 13 Jul. 2018) (unpub. op.) (citing *United States v. Strand*, 59 M.J. 455, 458 (C.A.A.F. 2004)).

"Whether a court-martial is properly constituted is an issue of law we review de novo." *United States v. Prasad*, No. ACM 39003 (reh), 2019 CCA LEXIS 246, at *8 (A.F. Ct. Crim. App. 10 Jun. 2019) (unpub. op.) (citation omitted), *rev'd on other grounds*, 80 M.J. 23 (C.A.A.F. 2020). Interpretation of a statute and a Rule for Court-Martial provision are also questions of law that we review de novo. *United States v. Hunter*, 65 M.J. 399, 401 (C.A.A.F. 2008) (citation omitted); *United States v. Martinelli*, 62 M.J. 52, 56 (C.A.A.F. 2005) (citation omitted).

In *United States v. Colon*, 6 M.J. 73, 74 (C.M.A. 1978), the absence of four members detailed to a ten-member general court-martial did not constitute jurisdictional error. In *United States v. Sargent*, 47 M.J. 367, 368 (C.A.A.F. 1997),

no jurisdictional significance was found when the statutory quorum of members were present in a general court-martial even though R.C.M. 805 stated "no court-martial proceeding may take place in the absence of any detailed member" and one member was absent and never excused.

Service members do not enjoy "due process protections above and beyond the panoply of rights provided to them by the plain text of the Constitution, the UCMJ, and the *MCM*." *United States v. Vazquez*, 72 M.J. 13, 19 (C.A.A.F. 2013).

Whether an accused has waived or merely forfeited an issue is a question of law we review de novo. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citing *United States v. Rosenthal*, 62 M.J. 261, 262 (C.A.A.F. 2005)). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Id.* (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)). When "an appellant has forfeited a right by failing to raise it at trial, we review for plain error." *United States v. Lopez*, 76 M.J. 151, 154 (C.A.A.F. 2017) (quoting *Gladue*, 67 M.J. at 313). To prevail under a plain error analysis, an appellant must show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (citations omitted). However, forfeited constitutional errors are assessed using the harmless beyond a reasonable doubt test in *Chapman v. California*, 386 U.S. 18, 24 (1967). *United States. v. Tovarchavez*, 78 M.J. 458, 468 (C.A.A.F. 2019). "*Chapman* directs that the government must show that the error was harmless beyond a reasonable doubt to obviate a finding of prejudice." *Id.* at 462–63 (citing *Chapman*, 386 U.S. at 24).

### 3. Analysis

As a threshold matter, we see no waiver by Appellant of this issue. The Government's erroneous statement that the excusals were made at a prior session meant there was no need for Judge Speranza to conduct a further inquiry on the record. While Appellant did not object or correct the Government, we cannot say from this record that the silence of the Defense was more than an oversight. We see no intentional relinquishment or abandonment of a known right to object that the excusals were "for good cause shown on the record." We conclude that Appellant forfeited the issue and will review for plain error.

Appellant's first assertion is that the convening authority did not constitute the panel in accordance with the UCMJ or the Rules for Courts-Martial and that the court-martial lacked jurisdiction to try him. We find Appellant's assertion of a lack of jurisdiction without merit. Precedent such as *Sargent* and *Colon* demonstrate that the issue of missing members is not a jurisdictional issue unless the number of court members falls below quorum. 47 M.J. at 368–

69; 6 M.J. at 74; *see also United States v. Malczewskyj*, 26 M.J. 995, 997 (A.F.C.M.R. 1988). While some of these cases involved R.C.M. 805 whereas this case involved R.C.M. 505, the fundamental issue is the same. The excusal of members for good cause, but only off-the-record, does not raise jurisdictional questions so long as the statutory quorum of members exists. At the time of Appellant's general court-martial in 2018, the statutory quorum was a panel of not less than five officer members. Article 16, UCMJ, 10 U.S.C. § 816. One colonel and four lieutenant colonels composed the panel who heard Appellant's case. There is no question they were each present during the open court sessions of findings and sentencing. Therefore, we reject Appellant's claims of a lack of jurisdiction.

Next, we address Appellant's claim—raised for the first time in his reply brief—that he was deprived of his "due process" rights to be tried by the panel that had been assembled in April of 2018.[19] Appellant cites one of our sister-service court opinions, *United States v. Latimer*, 30 M.J. 554 (A.C.M.R. 1990), and *Colon*—an absent-member case—as authority. Only *Colon* warrants further discussion. In *Colon* the military judge elected to start the general court-martial when only six of the ten detailed members had arrived by the time court was to start. The military judge stated, "It is after nine. Call them in. Whoever is not here will be noted as absent." 6 M.J. at 74. The issue in *Colon* was that the convening authority was never notified that four detailed members had not shown up for trial. *Id.* After rejecting a jurisdictional challenge, the United States Court of Military Appeals determined "as a matter of military due process," the conduct of the military judge amounted to error because Article 25(d)(2), UCMJ, permitted the convening authority to choose the basic composition of the court-martial assembled for trial. *Id.* at 74–75. Later, in rejecting a government waiver argument, the Court of Military Appeals noted that "[t]he concept of waiver has not been embraced with much affection by this Court where evidence of record clearly demonstrates that a military judge

---

[19] Appellant does not claim that jeopardy attached at the time the court members were assembled in April 2018 as in a civilian jury trial where jeopardy attaches when a jury is empaneled and sworn. *See Crist v. Bretz*, 437 U.S. 28, 35 (1978). Article 44(c), UCMJ, 10 U.S.C. § 844(c), provides that jeopardy does not attach in a court-martial until evidence is introduced and the CAAF has found this statute constitutional. *United States v. Easton*, 71 M.J. 168, 170 (C.A.A.F. 2012). In *Easton*, the CAAF noted that Article 29, UCMJ, "illustrates that, due to the unique nature of the military, an accused's chosen panel will not necessarily remain intact throughout a trial." *Id.* at 175. By enacting Article 29, UCMJ, "Congress evinced the intent that, in light of the nature of the military, an accused does not have the same right to have a trial completed by a particular court panel as a defendant in a civilian jury trial does." *Id.* at 175–76.

denied military due process to an accused at his court-martial." *Id*. at 75 (citation omitted). In essence, *Colon* twice referenced that missing court members without convening authority notification was a "military due process" issue.

In 2013, the United States Court of Appeals for the Armed Forces (CAAF) decided *Vazquez* and made clear that "due process" protections afforded service members are those in the plain text of the Constitution, the UCMJ, and the *MCM*, and rejected our court's mistaken reliance on the "amorphous concept" of "military due process." 72 M.J. at 15–19. Therefore, we will apply *Vazquez* though we note that its holding rejected an as-applied constitutional challenge to Article 29(b), UCMJ, and R.C.M. 805 while this case involves Article 29(a) and R.C.M. 505.

After considering *Vazquez* and the due process rights in the Constitution, the UCMJ, and the *MCM,* we reject Appellant's claim that he was entitled to have the court-martial which was assembled in April of 2018 try his case through findings and sentencing. First, we find no due process violation under the Constitution. *See id*. at 18–19 (discussing Congress is subject to the requirements of the Due Process Clause when legislating but courts "must give particular deference" in congressional determinations made under U.S. CONST. ART. I, § 8) (quoting *Weiss v. United States*, 510 U.S. 163, 176–77 (1994)). Second, we find no Article 29(a), UCMJ, violation. Congress specifically authorized a convening authority to excuse court members after assembly for good cause shown. Appellant's claim finds no support in the statutory language of Article 29(a), UCMJ, as the convening authority could have excused the entire panel after assembly if there was good cause to do so and still satisfied Article 29(a), UCMJ. Third, Appellant's due process claim also does not find support in the *MCM* as the President in promulgating R.C.M. 505 permitted a convening authority to excuse court members after assembly for good cause shown on the record. Therefore, under this rule, the convening authority could have excused the entire panel, after assembly, as long as the good cause was shown on the record. In essence, the rule's additional language of "on the record" merely requires off-the-record excusal decisions of the convening authority after assembly be directly addressed in some reasonable manner in open court. We reject Appellant's vague "due process" claim that he had the right to have the assembled panel in April 2018 decide the findings and sentence in his case.

We now address whether the convening authority complied with Article 29(a), UCMJ, by excusing two members after assembly. We find no plain or obvious error. Appellant challenges whether the excusal of Lt Col PBL was for "good cause." While the convening authority did not cite the reasons for excusal of Lt Col PBL, the advice of the staff judge advocate and the request of Lt Col PBL show the rationale. The staff judge advocate included the appropriate

"good cause shown" standard even though Article 29(a), UCMJ, was not specifically cited. We see no plain or obvious error in the excusal of Lt Col PBL who received an assignment notification to attend Air War College at Maxwell AFB and would begin classes before Appellant's trial resumed. R.C.M. 505(f) lists a "military exigency, and other extraordinary circumstances" which renders a member unable to proceed with the court-martial within a reasonable time as two types of good cause. Appellant has not shown that the selection for in-residence Air War College was plainly or obviously insufficient to be a military exigency or an extraordinary circumstance. To be clear, Appellant has not suggested that the convening authority excused Lt Col PBL for any improper reason, which, if alleged, would have warranted close scrutiny. Using the same rationale, we see no plain or obvious error under Article 29(a) in the excusal of Lt Col KW. The Secretary of Defense fellowship and subsequent follow-on assignment rendered Lt Col KW unable to continue to serve on Appellant's court-martial when it resumed. Appellant has not shown this was plainly or obviously insufficient to be a military exigency or an extraordinary circumstance. There is nothing before us to suggest that the convening authority's determination to excuse Lt Col KW was based on any improper reason.

We now reach the issue of whether good cause was "shown on the record" such that two excusals complied with R.C.M. 505(c)(2)(A). Starting with Lt Col PBL's excusal, we find it was plain or obvious error when the Government failed to show good cause for the excusal on the record. The record never demonstrated that Lt Col PBL had been selected for Air War College after the continuance was granted. Rather, the record only showed that Lt Col PBL was changing units and would still be assigned to JBMDL when court resumed. Without more, a reassignment on the same installation was an insufficient "on the record" showing for a good cause excusal after assembly. We conclude that this was a plain or obvious error to not announce the Air War College assignment as the good cause for Lt Col PBL's excusal for four reasons: (1) Special Order A-14 did not explain the reasoning for the post-assembly excusal; (2) no part of the excusal package was marked as an appellate exhibit; (3) trial counsel did not announce the substantive reasons for the excusal in open court; and (4) trial counsel misstated that some members, which included Lt Col PBL, had been excused at a prior session. We will assess whether there was material prejudice by this plain or obvious error below.

Turning to Lt Col KW's excusal, we find no plain or obvious error as we see sufficient good cause shown on the record. The excusal itself was documented on Special Order A-14 and Lt Col KW's selection for a Secretary of Defense fellowship was discussed during individual voir dire. Afterwards, in a session outside of the members' presence, the senior trial counsel stated, "I anticipate at least with [Lt Col KW] there might be an excusal." Judge Grocki replied,

"Yeah." Trial defense counsel said nothing. Under these circumstances, Appellant has not shown a plain or obvious error that good cause was not shown on the record. Lt Col KW's written excusal request from the convening authority showed similar reasons to those raised during individual voir dire. Further, the distinct possibility of Lt Col KW's excusal was discussed by the trial counsel and acknowledged by the military judge. Having resolved there was no plain or obvious error, we do not reach the question of Lt Col KW's excusal resulted in material prejudice.

Finally, we must determine whether material prejudice resulted from the excusal of Lt Col PBL for good cause, but with none "shown on the record" as required by R.C.M. 505(c)(2)(A)(i). The test for prejudice is "based on the nature of the right violated." *United States v. Clark*, 79 M.J. 449, 454 (C.A.A.F. 2020) (quoting *Tovarchavez*, 78 M.J. at 465). The standard of review and allocation of burdens depends on whether the defect amounts to a constitutional error or a nonconstitutional error. *Id.* at 454.

We do not find the noncompliance with R.C.M. 505(c)(2)(A)(i) to implicate Appellant's constitutional rights such that the Government must show the error was harmless beyond a reasonable doubt. "As a matter of due process, an accused has a constitutional right, as well as a regulatory right, to a fair and impartial panel." *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017) (citation omitted). However, there is no question raised about the fairness or impartiality of the panel members who sat on Appellant's case. In *Colon*—a case with four unexplained missing members—there was "a substantial reduction in the membership of the Court so as not to represent the kind of court contemplated by the convening authority in his original detail." *Malczewskyj*, 26 M.J. at 998 (quoting *Colon*, 6 M.J. at 75.). Here, the convening authority personally excused the members. We see no substantial reduction in the membership of the court such that it did not "represent the kind of court contemplated by the convening authority in his original detail." *Id.* Therefore, we conclude that the failure to show good cause on the record was a nonconstitutional administrative error made by the Government.

Even administrative errors are tested for prejudice, but under plain error Appellant would bear the burden of demonstrating material prejudice. In *United States v. Cook*, a dispute was raised whether the staff judge advocate violated R.C.M. 505(c)(1)(B)(ii) by excusing more than one-third of the detailed court-members before assembly. 48 M.J. 434, 436 (C.A.A.F. 1998). The CAAF declined to resolve the "computational dispute" of the parties but stated "[a]ny error with respect to such an administrative matter must be tested for prejudice." *Id.* (citation omitted). The CAAF then noted the appellant did not argue prejudice and did not object. *Id.* The CAAF stated "[t]here is nothing to indicate that, at the outset of trial, [the appellant] was dissatisfied with the panel or

that he wanted to give the convening authority an opportunity to alter its composition." *Id*. The CAAF opinion concluded that any error was "not plain error" and did not require the Government to bear the burden of showing that no prejudice existed. *See id*. We see similarities between the excusal of Lt Col PBL before us and *Cook*. Here, Appellant raised no concern with Lt Col PBL's excusal during his trial and had ample time to do so as the excusal occurred a month prior to court resuming. While Appellant raises a claim of prejudice now, we see no dissatisfaction raised at the outset of the trial with the panel that would hear his case.

The CAAF has also drawn a distinction between administrative mistakes and more egregious errors in the context of noncompliance with member selection under Article 25, UCMJ. *United States v. Dowty*, 60 M.J. 163, 173 (C.A.A.F. 2004). In *Dowty*, the CAAF stated that an

> error in preliminarily screening the members was not merely an "administrative mistake." As the error was more egregious, we conclude that the Government has the burden to demonstrate that the error did not "materially prejudice the substantial rights of the accused."

*Id*. (citing Article 59(a), 10 U.S.C. § 859(a) (2000)).

We do not see an egregious error like in *Dowty*. Here, the error was more attributable to a change of the senior trial counsel and confusion of the assistant trial counsel in documenting the excusal rather than a defect in the excusal process itself. The failure to state good cause on the record only involved one excused member, Lt Col PBL. The difference between the five members who decided the findings and adjudged the sentence and six members (if Lt Col PBL had also sat on the case) would not have impacted how many members would be needed for the Government to obtain a conviction based on the law at the time. Regardless of whether the panel was five officers or six officers, at the time, two-thirds or four members would have been needed to vote for a finding of guilty to any charge and specification. As Appellant was sentenced to less than ten years of confinement, the same two-thirds would have been needed to determine the sentence.

Appellant argues that prejudice lies in "not being tried by the panel originally assembled, particularly with respect to Lt Col PBL." Appellant argues the voir dire of Lt Col PBL demonstrated he "was a desirable panel member for Appellant because he had been falsely accused of sexually assaulting someone when he was 15 years old." In essence, Appellant would assess prejudice through his lens of a favorable panel, rather than the convening authority's lens of selecting a panel of his or her choosing under Article 25, UCMJ, criteria. We are not persuaded by Appellant's argument.

We see nothing in the record to indicate that the convening authority selected Lt Col PBL for service on Appellant's court-martial because of the prior false allegation against Lt Col PBL which was discussed during individual voir dire. Rather, the record indicates the convening authority followed the advice of the staff judge advocate and selected Lt Col PBL using the criteria listed in Article 25, UCMJ, as an officer best qualified by reason of age, education, training, experience, length of service, and judicial temperament. We also see nothing in the excusal package which identified the prior false accusation against Lt Col PBL which would have alerted the convening authority to the concern Appellant raises on appeal.

Even if the Government bears the burden of showing no material prejudice to Appellant and that the administrative error was harmless, it has done so. Lt Col PBL did not hear the evidence in this case, receive the instructions on the law, or participate in deliberations. We cannot ascertain how Lt Col PBL would have participated in deliberations with the members who heard this case. There is little question that Lt Col PBL knew first-hand that false complaints were possible, but the two court members detailed after assembly who heard Appellant's case also agreed that it was possible for someone to falsely accuse a person of a crime as serious as sexual assault. Under these circumstances, the Government has demonstrated that Appellant suffered no material prejudice from Lt Col PBL's excusal for good cause not being "shown on the record" under R.C.M. 505(c)(2)(A)(i).

### D. Legal and Factual Sufficiency

### 1. Additional Background

Appellant argues that "a fair and rational hypothesis other than guilt" exists because he "never performed oral sex on JK." Appellant cites the lack of eyewitnesses, physical evidence, or admissions of guilt by him. Appellant also challenges the evidence on the penetration element and JK's credibility. Some of these arguments warrant further discussion.

First, regarding physical evidence, Appellant asserts that the DNA evidence from JK's underwear was not conclusively tied to him as it could have belonged to his paternal male relatives who had lived in or visited his house. Appellant also argues that the male DNA, if his, could have been transferred to JK's underwear innocently, such as through laundry or a consensual massage. Appellant also argues that some of his DNA should have been on the swabs of JK's external genitalia if the incident occurred. Lastly, Appellant argues that AFOSI should have found bodily fluids during a search of his living room if the incident happened.

Second, regarding the penetration element, Appellant asserts that JK's statements at ND's house, in her SAFE narrative, and to AFOSI did not suggest penetration occurred.

Third and finally, regarding JK's credibility, Appellant states that she (1) was an admitted "liar and manipulator;" (2) had a reputation for untruthfulness within her own family; (3) wanted to move out because he was too strict; and (4) falsified the allegation against him to return to her biological mother.

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citation omitted); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

Based on the charge sheet, to convict Appellant of sexual assault in violation of Article 120, UCMJ, the Government was required to prove beyond a reasonable doubt: (1) that at or near JBMDL, New Jersey, on or about 11 September 2016, Appellant committed a sexual act upon JK by penetrating her vulva with his mouth; and (2) that Appellant did so by causing bodily harm, to wit: a nonconsensual sexual act with an intent to gratify the sexual desire of

either JK or Appellant. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45.b.(4)(b).

"Sexual act" includes "the penetration, however slight, of the vulva . . . of another by any part of the body . . . with an intent to . . . arouse or gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 45.a.(g)(1)(B). "Bodily harm" means "any offensive touching of another, however slight, including any non-consensual sexual act or nonconsensual sexual contact." *See MCM*, pt. IV, ¶ 45.a.(g)(3). "'[C]onsent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent." *MCM*, pt. IV, ¶ 45.a.(g)(8)(A). "Lack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist because of another person's actions." *MCM*, pt. IV, ¶ 45.a.(g)(8)(C). "The burden is on the actor to obtain consent, rather than the victim to manifest a lack of consent." *United States v. McDonald*, 78 M.J. 376, 381 (C.A.A.F. 2019).

### 3. Analysis

Appellant claims the lack of eyewitnesses and the absence of admissions of guilt by him demonstrate that there is a "fair and rational hypothesis other than guilt" that he "never performed oral sex on JK." We disagree. While some cases involve corroboration of victim testimony through eyewitness testimony or admissions of guilt by an appellant, the law does not require such evidence to sustain a conviction as legally and factually sufficient on appeal. The Government may meet its burden to prove each element beyond a reasonable doubt through testimony of only one witness "so long as the members find that the witness's testimony is relevant and is sufficiently credible." *United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006) (citations omitted). Here, JK's testimony established the elements of the charged Article 120, UCMJ, sexual assault offense. While Appellant challenged JK's credibility on several bases, as we will discuss in greater detail below, the members found JK sufficiently credible. The lack of other eyewitnesses or admissions of guilt do not render the conviction for this offense legally or factually insufficient.

#### a. Physical Evidence or Lack Thereof

Appellant's asserts that JK's testimony is not supported by the physical evidence in the case. We are not persuaded. The DNA evidence on the inside crotch area of JK's underwear provided some support to JK's testimony though it is correct that Appellant's paternal male relatives could not be excluded from the Y-STR testing results. Appellant offers several innocent reasons why male DNA—from which he could not be excluded—was found on the inside crotch of JK's underwear. But a reasonable factfinder who was considering whether the

DNA was transferred inadvertently through laundry or other means would have also realized that no other foreign DNA was found in the same location on JK's underwear. A reasonable factfinder would have realized the limits of the DNA results from the inside crotch of JK's underwear and concluded that it only provided some support for JK's testimony and should be considered along with all the other evidence in the case.

Regarding the absence of physical evidence, a reasonable factfinder could have concluded that there were legitimate reasons why certain biological evidence was not found and that the absence of the evidence did not mean that JK fabricated the assault. Specifically, Appellant argues if the incident occurred then his DNA would have been on the swabs of JK's external genitalia. This ignores the evidence that JK urinated and wiped prior to swabs being collected during the SAFE. The Government's expert DNA examiner testified this could affect DNA retention, a fact that would not have gone unnoticed by a reasonable factfinder. Additionally, eight swabs were collected from JK's external genitalia during the SAFE rather than the normal two. According to the Government's DNA expert, taking six additional swabs could have diluted any male DNA that was present. USACIL did not test all eight swabs because some needed to be saved. The Government's DNA expert explained that "[i]t could be that I didn't get a good sampling from each of the swabs." A reasonable factfinder could have determined that the above reasons accounted for why Appellant's DNA was not found on the external genital swabs of JK that USACIL tested.

Similarly, Appellant argues the outer mouth area swabs that AFOSI collected from him should have shown JK's DNA if the incident occurred. There is no question that no foreign DNA was found on the outer mouth swabs when tested. A reasonable factfinder would have considered that no foreign DNA was found, while recognizing the amount of time that passed and Appellant's access to a bathroom, before deciding what weight to give the results of his outer mouth swabs. A reasonable factfinder could have believed that the offense occurred as charged despite the absence of JK's DNA on Appellant's outer mouth swabs.

The final argument Appellant raises regarding absence of physical evidence is that AFOSI found no biological evidence in the downstairs living room. We disagree that this shows the offense was not committed. A reasonable factfinder could have considered JK's testimony and determined that the manner in which she described the offense would not have left biological evidence for AFOSI to observe with their crime-scene handheld LED light source and subsequently collect.

### b. Penetration

Appellant's next assertion is that JK's statements made at ND's house, during her SAFE, and to AFOSI did not suggest penetration occurred. We address each of these assertions in turn.

We agree that the evidence produced at trial did not include a description of penetration in JK's initial disclosure at ND's house. A reasonable factfinder would consider this, along with the other evidence in the case, but would also recognize that JK's initial disclosure did not involve questioning on the subject of penetration by ND's mother or security forces personnel.

JK's SAFE report is on a State of New Jersey Forensic Medical Examination Report. The acts of "licking/kissing" are checked "Yes" in the "oral contact" section of the form. The listed location of the oral contact is "vaginal area." The SAFE report has a section for "Penetration – Into Vagina" with three possible responses: By Finger(s), By Penis, By Foreign Object. Each of these is checked No. There is no block on the form for penetration by the mouth. The narrative JK provided was "dad then put his mouth on her vagina and licked the area." A reasonable factfinder could have determined that the SAFE report left open the question of whether penetration of JK's vulva occurred by Appellant's mouth. That the "foreign object" block might have been broad enough to include Appellant's mouth is not a strong indicator that JK denied penetration; the New Jersey form did not utilize a more precise question such as whether "any other body part" of Appellant penetrated JK's vulva, however slight.

JK's statements to AFOSI, as admitted into evidence, were definitive regarding penetration. JK was asked whether any part of Appellant's mouth penetrated inside of her vagina. JK responded, "It did penetrate." JK's trial testimony was consistent with her statement to AFOSI. JK testified that Appellant used his tongue and mouth to "orally stimulate" her and that he "partially" penetrated her vagina when doing so. A reasonable factfinder could have concluded that Appellant penetrated JK's vulva with his mouth, however slightly, as charged, based on JK's statements to AFOSI and her trial testimony, and discounted the disclosure at ND's house and the statements made during her SAFE on the subject of penetration.

### c. JK's Credibility

Appellant's challenges to JK's credibility are similar to the theories he posited in his AFOSI interview and raised during trial. It is true that JK admitted in cross-examination that she wrote in her journal that she lied "constantly" to her parents and friends. JK described her bigger lies as including whether she talked to teachers or did schoolwork. JK also agreed she lied to Appellant about having boyfriends and that sometimes she manipulated people. She agreed that she wrote that she wanted people to like her so badly that she faked who

she was. It is also true that Appellant's mother-in-law testified that JK had a reputation for untruthfulness amongst the entire family, though other witnesses, outside the family, testified to JK's character for truthfulness.

There is little question that Appellant and SK were strict with JK and in comparison to some of JK's friends much more strict. Appellant said no to JK's requests often enough to make her angry. But JK also testified that she loved Appellant and did not want to get him in trouble. JK denied that she made up a story about Appellant performing oral sex on her. A reasonable factfinder would have concluded that there was overwhelming evidence that JK wanted to remain in New Jersey where she attended school, was involved in sports, had close friends, and was seeking a relationship with a boy, CH. A reasonable factfinder could have concluded that Appellant's strict policies and parenting practices, while true, were not indicative of a fabricated sexual assault, especially as immediately before the assault JK and Appellant were alone, harmoniously watching movies together in the downstairs living room.

Lastly, there are some references to JK's biological mother in the evidence, but none which supported that JK fabricated the incident to return to live with her biological mother. JK was questioned about her relationship with her biological mother and it was essentially non-existent. JK's biological mother did not testify. Appellant's comments to AFOSI that JK's biological mother must somehow be behind JK's fabrication is wholly unsupported by the evidence. A reasonable factfinder would have determined that the evidence did not support a conclusion that JK fabricated the claims against Appellant to live with her biological mother.

We have considered whether the evidence about JK's lies, manipulations, and reputation for truthfulness in her family are such that we cannot believe her testimony and prior consistent statements to AFOSI that Appellant sexually assaulted her as charged. We also weighed Appellant's interview with AFOSI where he denied committing the offense yet also omitted how he massaged JK from his initial narrative of the evening. We closely examined how Appellant responded when AFOSI informed him of JK's specific accusation and found him evasive, especially when he unconvincingly pondered what movie the two had been watching even though in his initial narrative he had already told AFOSI the names of the exact two movies that had been watched. This evasiveness is evidence of his consciousness of guilt for us to consider with the other evidence presented before the court members.

This was not the first time that one of Appellant's massages made JK uncomfortable. The first time a massage became invasive, JK confided in her friends. A months-long massage ban followed that first incident. Appellant and JK agreed that the massage ban had been recently relaxed before 10 Septem-

ber 2016. By all accounts, JK and Appellant were happily alone in the downstairs family room, drinking alcohol, watching multiple movies, before a consensual massage began. Their prior parent/teenager disagreements and conflicts about school and life appear to us to be largely absent. Then, a short time after a consensual massage began, JK abruptly left the downstairs living room without her cell phone, found an alternative method to message ND, fled her house despite the late hour, and believed she saw Appellant outside. These actions provide strong circumstantial evidence that one of Appellant's massages became invasive, again, and resulted in the sexual assault, as charged. We have considered the evidence from Appellant's family members and friends who essentially believe that Appellant was incapable of committing this offense and that JK fabricated it. We conclude that a reasonable factfinder could have found that every essential element of the sexual assault offense was proven beyond a reasonable doubt.

Drawing "every reasonable inference from the evidence of record in favor of the [P]rosecution," the evidence was legally sufficient to support Appellant's conviction of sexual assault of JK beyond a reasonable doubt. *See Barner*, 56 M.J. at 134 (citations omitted). Moreover, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses as the members did, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Appellant's conviction for sexual assault of JK is both legally and factually sufficient.

## E. Prior Consistent Statements

### 1. Additional Background

The military judge admitted, over defense objection, several statements of JK as prior consistent statements under Mil. R. Evid. 801(d)(1)(B) after JK was cross-examined about several motives to fabricate. Two subsequent witnesses in the Government's case-in-chief, ND's mother and a security forces member, testified to hypothetical statements that JK made when inside ND's house. While styled initially as hypotheticals, JK clarified for the witnesses that Appellant was the father in the hypotheticals and she was the daughter. During rebuttal, an audio recording of JK's statements to AFOSI was played for the court members.

Some of JK's motives to fabricate existed before she reported what Appellant did to her. Two motives which were prominently featured were: (1) that JK wanted to date a boy, CH; and (2) JK wanted to attend to college at The Pennsylvania State University (Penn State) with CH. Regarding dating CH, Appellant would not let JK date CH until the family met him. In the days before JK reported the incident before us involving Appellant, CH made a short visit to the house and met her parents and paternal grandparents. After the

visit, JK and CH tried to organize a date to go to the movies. Regarding college choices, JK had already told CH her top choice was Penn State.

However, there were many times during cross-examination where trial defense counsel asked JK questions about events and motives that occurred well after JK reported Appellant. These events and motives included that (1) JK started a dating relationship with CH about a week after she reported; (2) their first in-person date was at an on-base concert 12 days after she reported; (3) JK moved to Montana to live with Appellant's parents and hated being away from CH; and (4) after her 18th birthday, JK returned to New Jersey and moved in with CH and his parents. JK was also cross-examined that, at the time of trial, she (1) lived with CH in Pennsylvania; (2) would be attending Penn State in the upcoming semester; and (3) was now engaged to CH.

The first witness to testify about JK's prior statements in the Government's case-in-chief was ND's mother. Before allowing ND's mother to testify, the military judge conducted a hearing outside of the court members' presence to address two objections by the Defense: hearsay and cumulativeness. The Government argued that JK's prior statements were not hearsay because they were prior consistent statements under Mil. R. Evid. 801(d)(1)(B). The military judge agreed with the Government and concluded that the Defense's cross-examination questions about JK "going to Penn State" and "moving in with her boyfriend, [CH]" showed the Defense had "tried to establish a motive or at least inference of an improper, influence, or motive." The military judge overruled the hearsay objection and we find his ruling is consistent with the language in Mil. R. Evid. 801(d)(1)(B)(i). The military judge also overruled an objection that ND's mother's testimony was cumulative with JK's testimony as she was the first witness to testify to a prior consistent statement of JK.

Pertinent to Appellant's offenses,[20] ND's mother testified that JK said

---

[20] As described above, ND's mother also testified about a hypothetical that JK told about an allegation made against a "stepfather" by "a young girl" before the girl came to live with her dad. Appellant has not claimed error. However, even if we assume that it was a plain or obvious error to admit this portion of the hypothetical because the military judge had ruled that only limited testimony was allowed about JK's allegation against her stepfather, we find no prejudice as this testimony had no substantial influence on the findings or sentence. In particular, the evidence lacked materiality because its subject matter involved wrongdoing by JK's stepfather, not Appellant, and few details on the nature of the allegation were given to the court members. *See United States v. Ayala*, 81 M.J. 25, 29 (C.A.A.F. 2021).

> hypothetically she was at home watching a movie with her dad, her mom went to sleep along with her siblings. . . . she was complaining about a groin pain . . . he gave her some wine . . . he said he would massage the place where she had the pain in her groin and then he started massaging her leg and then his hands went under her shorts and her underwear.

ND's mother did not mention oral penetration when testifying about JK's hypothetical.[21] However, ND's mother did testify that (1) the dad in the hypothetical asked afterwards "will you tell mom?" and (2) JK said she left her house and crossed a wooded area before arriving at ND's house.

The second witness to testify about JK's prior statements during the Government's case-in-chief was Master Sergeant (MSgt) AD, a security forces patrolman who responded to the "potential break-in" only to find JK outside the house. Trial defense counsel objected to MSgt AD's testimony as hearsay and cumulative with ND's mother's testimony. The Defense declined the military judge's offer of another hearing outside of the members' presence. The military judge overruled both objections. Regarding the hearsay objection, the military judge found JK's statements preceded the motive to fabricate and improper influence. Regarding cumulativeness, the military judge cited Mil. R. Evid. 403 and ruled the probative value of the prior consistent statements was "not outweighed by the dangers of unfair prejudice."

MSgt AD testified that JK said

> what if this girl was out playing sports and sustained an injury playing soccer and . . . was offered to be massaged in her thigh area by [her] father. Hypothetically, what if this person's father made sexual advancements. Hypothetically, what if this person's father tried to perform oral sex.

During the Defense's case-in-chief, several witnesses testified to Appellant's character for truthfulness. Appellant's wife, SK, testified about family dynamics. Appellant's mother-in-law testified that JK had a reputation "amongst the entire family" for untruthfulness. Appellant's father described JK's relationship with CH after the allegations when JK lived with Appellant's parents for a time in Montana. Appellant's father observed JK spending an average of at least five hours a day communicating with CH in various ways.

---

[21] The record of trial contains the AFOSI report of investigation which shows a summary of an interview ND's mother completed with AFOSI agents three days after the incident. In that summary, JK's hypothetical included "if a man is sitting watching a movie and a man rubs their daughter's legs and puts his mouth 'down there.'" ND's mother did not write a statement to AFOSI.

He opined that, at the time, JK wanted to return to New Jersey because she loved CH and wanted to live with CH.

During rebuttal and over defense objection, the military judge permitted the audio of JK's video-recorded interview with two AFOSI agents to be played in open court as a prior consistent statement. The military judge reviewed a transcript of the interview before ruling on its admissibility. The military judge's ruling focused on the post-interview motives to fabricate that were brought up in cross-examination of JK and later in the Defense's case-in-chief. The military judge found admitting the video recording itself as a prosecution exhibit and letting the court members view it would raise some danger of prejudice as the court members could use it to evaluate the demeanor of the AFOSI agents and JK. Therefore, the military judge only permitted the audio to be played. The military judge ruled the "interview itself" was not a statement and that the questions and comments by the agents were not admissible as substantive evidence and could only be considered for their effect on JK as a listener. The military judge ruled two areas were admissible as prior consistent statements: statements related to (1) whether JK lied about why she went to ND's house; and (2) "the allegations themselves." The Defense also objected that JK or the AFOSI agents were not on the witness stand when the audio was played. The military judge overruled this objection.

**2. Law**

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Finch*, 79 M.J. 389, 394 (C.A.A.F. 2020) (citing *United States v. Frost*, 79 M.J. 104, 109 (C.A.A.F. 2019)). "A military judge abuses his discretion when his findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision . . . is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Kelly*, 72 M.J. 237, 242 (C.A.A.F. 2013) (citation omitted).

"Hearsay statements—out of court statements offered into evidence to prove the truth of the matters asserted—usually are inadmissible in courts-martial." *United States v. Norwood*, 81 M.J. 12, 17 (C.A.A.F. 2021) (citing Mil. R. Evid. 801(c)), *cert. denied*, ___ S. Ct. ___, 2021 U.S. LEXIS 3528 (28 Jun. 2021). Mil. R. Evid. 801(d)(1)(B) provides that a statement is not hearsay if it "is consistent with the declarant's testimony and is offered: (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground." Prior consistent statements "may be eligible for admission under either [Mil. R. Evid. 801(d)(B)(i)] or (B)(ii) but not both." *United States v. Ayala*, 81 M.J. 25, 28 (C.A.A.F. 2021).

A prior consistent statement may be admitted as substantive evidence if three threshold requirements are met: "(1) the declarant of the statement testifies at the court-martial, (2) the declarant is subject to cross-examination, and (3) the statement is consistent with the declarant's testimony." *Norwood*, 81 M.J. at 17 (citations omitted). The party that attempts to admit the prior consistent statement into evidence bears the burden of proving that it is admissible. *Id.*

A key question in considering admission under Mil. R. Evid. 801(d)(1)(B)(i) is "whether the prior statements came before or after the alleged motive to fabricate." *Ayala*, 81 M.J at 28. The CAAF identified "two additional guiding principles that govern admission" under Mil. R. Evid. 801(d)(1)(B)(i). *Id.* at 28–29 (citation omitted). These guiding principles are: "the prior statement . . . must precede any motive to fabricate or improper influence that it is offered to rebut," and "where multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut." *Frost*, 79 M.J. at 110 (citations omitted).

"The military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." Mil. R. Evid. 403. Where a military judge conducts a proper balancing test under Mil. R. Evid. 403, an appellate court will not overturn the ruling absent a clear abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010) (citing *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998)). However, we "give[ ] military judges less deference if they fail to articulate their balancing analysis on the record, and no deference if they fail to conduct the Rule 403 balancing." *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citation omitted).

Whether an accused has waived or merely forfeited an issue is a question of law we review de novo. *Ahern*, 76 M.J. at 197 (citation omitted). "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *Id.* (quoting *Gladue*, 67 M.J. at 313). When "an appellant has forfeited a right by failing to raise it at trial, we review for plain error." *Lopez*, 76 M.J. at 154 (quoting *Gladue*, 67 M.J. at 313). To prevail under a plain error analysis, an appellant must show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *Erickson*, 65 M.J. at 223 (citations omitted).

### 3. Analysis

Appellant argues the military judge erred by admitting the witness testimony and permitting the audio recording to be played because: (1) the prior statements did not precede JK's motive to lie; and (2) the prior statements were inconsistent with JK's trial testimony. Regarding JK's recorded statements to AFOSI, Appellant also asserts the military judge abused his discretion by admitting the statements "without first viewing the interview."[22] We address these arguments in turn.

#### a. Preceding JK's Motive to Lie?

The military judge ruled three times on this issue. Regarding the testimony of the two witnesses, the military judge found the inference of a recent motive to lie or be improperly influenced were raised by the Defense's cross-examination questions about JK "going to Penn State" and "moving in with her boyfriend, [CH]." For the audio of JK's AFOSI interview, the military judge found the Defense elicited evidence that JK was impliedly influenced by her "desire to live with [CH], to go to school at Penn State near or with [CH], and to continue her relationship that led to her being engaged to [CH]."

At trial and on appeal, Appellant asserts that JK's sole motive to lie about the allegations existed before she made any statements at ND's house or to AFOSI. A summary of the Defense's position is that JK lied about the allegations from the beginning to get out of Appellant's house and away from his strict rules so JK and CH could be together. We find the military judge did not abuse his discretion in finding the Defense implied a recent motive or improper influence.

The Defense's cross-examination of JK was wide ranging. It addressed not only JK's motive to lie when she lived with Appellant under his strict rules, but also implied that JK was being improperly influenced to lie under oath at Appellant's trial. The Defense's case-in-chief raised this same inference of improper influence, particularly from the testimony of Appellant's father who observed JK's and CH's relationship when JK lived in Montana after the allegations.

We can understand the approach taken by the Defense in this case. If JK fabricated the allegations to get out of Appellant's house to be with CH, she achieved those results well before her trial testimony. The defense approach

---

[22] Appellant's brief raises two more arguments regarding this evidence: (1) the audio of the AFOSI interview was not proper rebuttal evidence; and (2) the military judge provided no legal support for his conclusion that JK's interview was not a statement. We find these two arguments warrant no further discussion or relief. *See Matias*, 25 M.J. at 361.

was to go further and offer motives why JK also would participate in Appellant's trial and lie under oath. To this end, the Defense implied specific improper influences at the time of JK's testimony such as her current relationship and engagement to CH and her current living situation. These improper influences could not have existed at the time of JK's prior statements at ND's house and to AFOSI. JK did not even have her first date with CH until 12 days after the prior statements. She did not live with CH yet, had not been accepted to Penn State, and did not live in Pennsylvania. This line of questioning permitted the Defense to argue that JK was lying in her trial testimony to preserve her current situation with CH. We conclude the military judge did not abuse his discretion by finding a recent motive to lie or be improperly influenced.

We acknowledge that cases with recent improper influences often involve allegations of "coaching" by the Prosecution. *Ayala*, 81 M.J. at 31 (Maggs, J., concurring) (citation omitted) (cases involving coaching are not uncommon). Here, the Defense did not question JK about her preparation for trial with prosecutors, JK's special victims' counsel, or others. But the military judge did not rely on "coaching" to admit the prior consistent statements and instead relied on other recent motives to lie or be improperly influenced.

We also note that a passing reference during cross-examination to JK's current situation would have been insufficient to establish an implied improper motive. However, here the references were such that the military judge "could infer" that the Defense was relying on the "suggestive force of questions . . . to carry the message." *See Norwood*, 81 M.J. at 18 (citing 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence*, § 8:39, at 341 (4th ed. 2013)). The references to JK's current living situation, college attendance, and engagement with CH were extensive and delivered an obvious message to the court members. Additionally, the prior statements did not need to precede all motives or inferences, but only the one they were offered to rebut. *See Frost*, 79 M.J. at 110.

### b. Inconsistent with JK's Testimony?

Appellant also argues that JK's trial testimony was not consistent with her prior statements to ND's mother, MSgt AD, and the AFOSI agents. We find that Appellant forfeited these claims by failing to object on this specific ground at trial and that Appellant has not met his burden to demonstrate plain error.

### i) ND's mother

Appellant argues that ND's mother did not recount anything about any "oral sex" and this demonstrates an inconsistency with JK's trial testimony. The Defense did not raise this objection at trial, either before or after ND's mother testified. After objecting to JK's motive to lie as addressed above, the Defense argued that ND's mother's testimony would be cumulative because

"there's nothing inconsistent." The military judge overruled the cumulativeness objection noting that ND's mother was the first witness to testify about a prior consistent statement of JK.

We agree that ND's mother did not testify about Appellant performing oral sex on JK. Prior to ND's mother's testimony, trial defense counsel objected that the testimony would be consistent with JK's testimony and therefore should be excluded as cumulative. However, it is possible that the Defense did not know that ND's mother would omit any reference to "oral sex" when the initial objections were made because the military judge did not have ND's mother testify to JK's hypotheticals prior to ruling on their admissibility as a prior consistent statement. This weighs in favor of forfeiture rather than waiver.

Once ND's mother testified and did not mention the subject of "oral sex," the Defense failed to object that there was an inconsistent statement amidst several consistent statements. We can understand two primary reasons why trial defense counsel would intentionally decide not to object to the portion that was inconsistent. First, the failure to mention "oral sex" could be used by the Defense to show that JK's story was embellished between the time of the hypothetical and the time she interviewed with AFOSI. In closing argument this point was raised: "The evidence shows her story is likely fictitious and embellished . . . let me tell a hypothetical… oh, did they react to that hypothetical with big eyes and shock… oh, well now it actually happened." Second, JK had already been impeached with her prior inconsistent statements during cross-examination so the Defense would be confident that the military judge would instruct the court members on how JK's prior inconsistent statements could be used. The inconsistency between the hypothetical and the trial testimony could be added to the list of prior inconsistent statements, albeit one not properly obtained through impeachment on cross-examination, and potentially argued. The prior inconsistent statement instruction was given that if the members believed inconsistent statements were made by JK, the members may consider those inconsistencies in deciding whether to believe her in-court testimony. The Defense used the above to argue during a section of the argument about "oral sex" that JK gave a "different version" of the events to ND's mother.[23]

It is a close call on whether the record demonstrates that the Defense waived the issue by intentionally relinquishing or abandoning the known right to object on the grounds of inconsistency. The CAAF has made clear that the

---

[23] The Defense may have also been concerned that if the inconsistency was objected to then the trial counsel would have attempted to refresh ND's mother's recollection with the AFOSI summary of her interview and show there was no inconsistency, just a momentary memory lapse. As described earlier, the AFOSI summary included the phrase "puts his mouth 'down there'" which would be more consistent with JK's testimony.

Courts of Criminal Appeals have discretion, in the exercise of their authority under Article 66, UCMJ, to determine whether to apply waiver or forfeiture in a particular case, or to pierce waiver or forfeiture in order to correct a legal error. *See, e.g., United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (quoting *Quiroz*, 55 M.J. at 338); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016). If the military judge asked whether the Defense had any additional objections after ND's mother had testified and there was no objection, we would find waiver. *See United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (stating when counsel "expressly and unequivocally acquiesc[e]" to instructions from the military judge, they have "waived all objections to the instructions"). As that did not occur, we exercise our discretion to apply forfeiture and test for plain error.

We find Appellant has not carried his burden to show the military judge plainly or obviously erred by not *sua sponte* addressing the omission of the "oral sex" reference from ND's mother's testimony as an inconsistency. The military judge could have easily concluded that he "must avoid undue interference with the parties' presentations or the appearance of partiality," and this weighs against a finding that a plain or obvious error existed. R.C.M. 801(a)(3), Discussion. As the military judge did not intervene, the parties were permitted to address and did address the matter in their closing arguments, each arguing a position on the merit of the inconsistency, or a lack thereof. Additionally, Appellant cannot show he was materially prejudiced by the admission of the inconsistency as it strengthened his challenge to JK's credibility.

### ii) MSgt AD

The Defense raised two objections before MSgt AD testified to his recollection of JK's prior statements at ND's house: hearsay and cumulativeness. The Defense declined a hearing outside the members' presence and specifically noted "the testimony has already been elicited from another witness." The military judge overruled the objections. Neither side requested clarification of the military judge's ruling before or after MSgt AD's testimony.

Before us, Appellant argues that JK's prior statement to MSgt AD that Appellant had "tried" to perform "oral sex" upon JK is inconsistent with JK's testimony that penetration occurred. Appellant also argues MSgt AD's testimony on this point is inconsistent with ND's mother's testimony which omitted any mention of "oral sex." Neither of these objections were raised at trial. As with ND's mother's testimony, we find waiver to be a close call and exercise our discretion to apply forfeiture.

We find Appellant has not carried his burden to show the military judge plainly or obviously erred by not *sua sponte* addressing the potential inconsistency that Appellant had "tried" to perform "oral sex" as it related to JK's

testimony and ND's mother's testimony. The military judge could have easily concluded that he should avoid intervention and let the parties address the evidence in their closing arguments. Additionally, at this point in the trial, the parties had not given the military judge a position on whether the court members should be instructed on the lesser-included offense of attempted sexual assault in violation of Article 80, UCMJ, 10 U.S.C. § 880. Later in this trial the parties expressly requested no lesser-included offense instructions. By not intervening, the military judge allowed the parties to address the inconsistency in their closing arguments. The parties did so and each argued a position on the merit of the inconsistency, or a lack thereof. Additionally, Appellant cannot show he was materially prejudiced by the admission of the inconsistency as it strengthened his challenge to JK's testimony regarding penetration.

### *iii) Audio of AFOSI interview*

When the Government offered JK's statements to AFOSI in rebuttal, the Defense objected on two grounds: (1) that the timing of JK's motives to lie preceded her statements to AFOSI; and (2) the statements did not rebut the Defense's case-in-chief. In articulating their first objection, the Defense stated that JK's "story has essentially remained the same" and it "is the same exact story" from the time of the initial report. There was no objection that the statements to AFOSI were inconsistent with JK's trial testimony. Regarding the objections that were made at trial, we have addressed the timing of JK's motive to lie earlier in this opinion and we found no merit to the claim that the statements were not rebuttal. Appellant raises one additional claim for the first time on appeal that warrants discussion.

Before us, Appellant argues that JK's statements to AFOSI that Appellant pulled her "pants" off was inconsistent because JK's trial testimony was that she was wearing "shorts." The Government concedes this discrepancy but asserts that it is not a material difference because JK also testified during cross-examination that she generally refers to "pants as anything from shorts, to jeans, to soccer pants." As above, we use our discretion to apply forfeiture and conclude there was no plain error because there was no material prejudice from the admission of this inconsistency. First, the evidence of this inconsistency was already before the members from JK's testimony. Second, trial defense counsel addressed this discrepancy and at one part of the closing argument stated: "This case is not about whether [JK] was wearing shorts or underwear -- or pants or whatever. It has nothing to do with that." While appellate defense counsel sees significance in this discrepancy, we disagree and find Appellant has not shown material prejudice for the reasons outlined above.

### c. Failure to watch the video

Appellant argues the military judge's ruling on the audio of JK's statements to AFOSI was "troubling" because the video was not viewed before admission. The record demonstrates that the Government sent the video to the military judge but it could not be downloaded due to its size. Subsequently, the trial counsel sent a transcript to the military judge and trial defense counsel which the military judge received and reviewed prior to ruling. The military judge did not admit the video, he only allowed audio portions of it to be played. Appellant argues that if the military judge had viewed the video he "might have noticed" that JK's statements to AFOSI were not consistent with her trial testimony on the issue of penetration and not viewing the video was an abuse of discretion.

The military judge had a transcript of the AFOSI interview of JK and reviewed it before ruling. We disagree with Appellant that viewing the video would have changed the military judge's ruling. Appellant did not raise an objection that JK's statements to AFOSI regarding penetration were inconsistent with her trial testimony. The transcript accurately reflects JK's statements to AFOSI, and we can discern no reason why watching the video would have led to a different ruling that was favorable to Appellant, especially as he did not object. We see no error or abuse of discretion when the military judge reviewed a transcript before admitting the audio of JK's prior statements to AFOSI.

## F. Ineffective Assistance of Counsel

### 1. Additional Background

Appellant's trial defense team included two civilian attorneys, Mr. ST and Ms. BPO, and one military attorney, Captain (Capt) DA.[24] Mr. ST represented Appellant at all sessions of the court-martial. Ms. BPO and Capt DA did not represent Appellant at his arraignment and initial motions hearing, but represented him at all court sessions thereafter. At the time of Appellant's court-martial, Mr. ST and Ms. BPO were part of the same law firm but worked in different locations. Prior to trial, the convening authority approved several defense requests for expert consultants including Dr. BS, a forensic psychologist.

Appellant alleges ineffective assistance of counsel for eight reasons:[25] (1) Mr. ST behaved erratically; (2) Mr. ST undermined his co-counsel, Ms. BPO; (3) Mr. ST was not prepared for trial; (4) his counsel failed to implement and

---

[24] Appellant released his first military defense counsel after the first session of court and Capt DA was subsequently detailed to represent him. There are no claims of ineffective assistance of counsel against Appellant's first military defense counsel.

[25] Appellant presented the first three reasons together. For ease of analysis, we have separated them. We have also reworded the reasons.

execute a cohesive defense strategy; (5) his counsel failed to voir dire a court member, Lt Col SJ, regarding her knowledge of the case and Appellant; (6) Ms. BPO cross-examined JK about the allegation of abuse that she made against her stepfather that resulted in a conviction; (7) his counsel failed to identify a canceled retention bonus as an Article 13, UCMJ, violation; and (8) his counsel failed to present evidence of the financial loss of Appellant's retirement benefits during sentencing.

In response to Appellant's claims, we ordered Mr. ST and Ms. BPO to provide declarations and both complied. Subsequently, Ms. BPO voluntarily provided a second declaration which Appellant moved to be attached to the record of trial. We granted the motion. We also granted a motion to attach declarations from Appellant, his family, and his friends who observed the performances of Mr. ST and Ms. BPO during preparation and trial. We granted subsequent motions to attach two declarations from one of the appellate defense counsel regarding Mr. ST's background as a former judge advocate and communications with Mr. ST regarding the claims of ineffective assistance of counsel. We considered the declarations to resolve the above claims. *See Jessie*, 79 M.J. at 442 (allowing a Court of Criminal Appeals (CCA) to accept affidavits when necessary for resolving claims of ineffective assistance of counsel when raised by the record but are not fully resolvable by the materials in the record).

We considered whether a post-trial evidentiary hearing is required to resolve factual disputes among these declarations and though Appellant requests we order one, we are convinced such a hearing is unnecessary for reasons we describe in our analysis. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay*, 37 C.M.R. 411, 413 (C.M.A. 1967).

**2. Law**

The Sixth Amendment[26] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competent representation. *See Gilley*, 56 M.J. at 124 (citations omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). We review allegations of ineffective assistance de novo. *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (citation omitted).

We utilize the following three-part test to determine whether the presumption of competence has been overcome: (1) are appellant's allegations true, and

---

[26] U.S. CONST. amend. VI.

if so, "is there a reasonable explanation for counsel's actions;" (2) if the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers;" and (3) if defense counsel were ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result? *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted). In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted).

An appellant overcomes the presumption of competence only when he shows there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *Akbar*, 74 M.J. at 379 (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)).

"Failure to pursue a particular legal claim, however, is not necessarily deficient conduct by counsel." *United States v. Batson*, No. ACM 39637, 2021 CCA LEXIS 74, at *74 (A.F. Ct. Crim. App. 18 Feb. 2021) (unpub. op.). "If that claim is not shown to have a reasonable probability of being found meritorious as a matter of law and fact, the failure to pursue it is not error and certainly not ineffective assistance of counsel." *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002) (citation omitted).

The CAAF has instructed that "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice [then] that course should be followed." *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citation omitted).

### 3. Analysis

#### a. Erratic Behavior of Mr. ST

In general, this claim is based on the declarations submitted by Appellant, his family, and his friends of their observations of Mr. ST during trial preparation and in court. Additionally, one of the appellate defense counsel who knew Mr. ST from his prior service as a judge advocate offers an opinion of

what may have occurred during trial. On the whole, these declarations offer varying degrees of speculation about whether Mr. ST had a mental health condition that affected his trial preparation, decision making, and courtroom performance. Mr. ST provided a responsive declaration to our court order on this subject which we have considered along with how he actually performed from our review of the record of trial. The specifics of the claimed mental health conditions from the declarations remain sealed in the record of trial and disclosure is unnecessary to resolve the legal issue before us.

To the extent that the declarations contain speculative or conclusory observations about Mr. ST's mental health or reflect an attempt to render a medical diagnosis from courtroom observations alone, we have rejected those claims on that basis. *See Ginn*, 47 M.J at 248. We considered the relevant portions of the declarations that were not speculative and have determined that even if we resolve factual disputes on erratic performance in Appellant's favor relief is still not warranted. *See id*. Appellant has not demonstrated a reasonable probability that there would have been a different result during findings or sentencing.

The Government agrees in its answer that Mr. ST bore an ethical duty of competence in his representation of Appellant. However, it argues that there is no prevailing professional norm that required Mr. ST to (1) cease practicing law; or (2) inform Appellant of the alleged mental health diagnosis. The Government argues Appellant has failed to state a claim for relief for erratic performance.

In his reply brief, Appellant concedes that Mr. ST had no ethical duty to disclose a mental health condition to him. However, Appellant identifies three points where Mr. ST displayed "outward symptoms of erratic behavior" which show that his judgment negatively affected his abilities in court. These include (1) a comment by Judge Grocki after Mr. ST's motion argument for illegal pretrial punishment that Mr. ST "fluctuated like the wind here; where we started with one thing, went to another, and then came back to something completely different;" (2) a "sudden" decision to change strategy from the planned defense case-in-chief based on the advice of a non-attorney; and (3) a disjointed closing argument on findings.

On the first point, there is no question that Judge Grocki made one comment that Mr. ST's argument had "fluctuated like the wind" after one of the two motions on illegal pretrial punishment was argued. Judge Grocki did not state or imply that Mr. ST's argument contained such serious errors that Mr. ST was not functioning as counsel guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687. Judge Grocki correctly summarized the legal issues that were raised and the relief sought immediately after the motion argument concluded. Appellant has not demonstrated that if Mr. ST had made a

different or more cohesive motion argument that Judge Grocki would have ruled differently. On appeal, we are able to understand the legal arguments presented on this motion without difficulty, and we have not granted relief for any illegal pretrial punishment allegations raised. Appellant has not demonstrated a reasonable probability of a different result on this motion.

On the second point, there is general agreement that the Defense initially planned to call a number of findings witnesses from their witness list. Ms. BPO stated the number was "over 15." However, once the Government rested its case and the court recessed for the weekend, Dr. BS—the defense forensic psychologist consultant—suggested a change in strategy to Mr. ST. The suggestion was that the Defense should take a "bold" approach and rest immediately without presenting any evidence. Dr. BS had seen the strategy work before against the lead prosecutor and result in an acquittal. Ms. BPO was not present when Mr. ST and Dr. BS discussed this matter. Rather, she was with Appellant and his family and was preparing the witnesses who would testify. When Mr. ST arrived, he proposed the new strategy to Appellant, Ms. BPO, and the others who were present. There was understandable surprise given the timing of the announcement and because Ms. BPO had just been preparing witnesses. After leaving Appellant and the others, Mr. ST and Ms. BPO discussed strategy during a car ride. Ms. BPO "strenuously disagreed" with the new strategy.

The next day discussions about the new strategy continued and according to Ms. BPO the discussions became heated. Ultimately, Appellant decided to present some findings witnesses, but not all who were originally planned. Appellant declares this strategy was "far weaker than what [they] had originally planned" and that "it did not work" and "was not the strategy" he wanted. In total, 11 witnesses were called or recalled during the Defense's case-in-chief. They testified to Appellant's character for truthfulness, JK's character for untruthfulness and manipulation, investigative deficiencies, and innocent explanations for the DNA evidence. In her second declaration, Ms. BPO opines that this sudden change in strategy was "detrimental" to Appellant's case but provides us no examples of what was omitted or why it was detrimental. Appellant has not provided us names or expected testimony from any witnesses that were planned to be used but were not called. Therefore, he has not demonstrated a reasonable probability of a different result.

We also note that it is entirely unremarkable to us that two experienced lawyers like Mr. ST and Ms. BPO might disagree on whether to change a planned trial strategy or how best to do it. The environment of criminal litigation is fluid and in our experience reasonable lawyers sometimes disagree, even vehemently, about the best approach for the Defense to take. We also see no violation of a professional norm by a lawyer receiving a suggestion on strategy

from a defense confidential forensic psychologist. While the strategy change is characterized as "sudden" on appeal, it appears to us that the decision was raised with sufficient opportunity to implement it effectively when trial resumed. Appellant has not shown prejudice from the change from his planned trial strategy to the one that was used.

On the third point, Mr. ST delivered the findings closing argument which Appellant characterizes as disjointed. Ms. BPO's second declaration notes that Mr. ST seemed "ill prepared" for closing argument and he did not incorporate recommendations she made to him on Post-It® notes. Appellant has not demonstrated prejudice from the closing argument that was presented. Mr. ST argued a wide variety of topics such as (1) JK was inconsistent in her statements, had lied in the past, was known to be manipulative, and had multiple motives to lie; (2) the DNA evidence did not corroborate JK's testimony; (3) the Government had failed in its burden of proof for multiple reasons; (4) that AFOSI did not confront JK with her inconsistencies; (5) that AFOSI tried to deceive Appellant during his interview; (6) that witnesses vouched for Appellant's character for truthfulness; and (7) that the members should use their notes on matters that Mr. ST failed to mention in his argument to discover even more examples of reasonable doubt.

Appellant concedes that a poorly executed closing argument, in and of itself, is not ineffective assistance of counsel. Still, he asserts that Mr. ST should have argued *inter alia* (1) inconsistencies in JK's hypotheticals; (2) the evolution of JK's story; and (3) that there was no evidence of penetration. We have considered the merits of these proposed additional arguments and see no reasonable probability of a different result if they had been made. The arguments of counsel are not evidence, and we will not second-guess the matters which counsel choose to highlight in an argument. Mr. ST explained to the members that there were additional areas that might raise reasonable doubt that he may not have raised. His decision to argue the members should review their notes for these areas was reasonable and appropriate even if it did not result in an acquittal. Appellant has not demonstrated that an argument with these features would have a reasonable probability of an acquittal. Similarly, a more structured and organized argument may have been easier to follow for the members, but Appellant has not shown how this could have reasonably changed the findings. Finally, we do not know the content of the Post-It notes that Ms. BPO proposed to Mr. ST during argument so we cannot evaluate their merit or conclude that if incorporated, the court members reasonably would have acquitted Appellant.

### b. Undermining Ms. BPO

According to Appellant, after Ms. BPO opposed the new strategy, Mr. ST pulled him aside with Dr. BS and Capt DA and asked him to fire Ms. BPO.

Appellant declares he was "living a nightmare" and "did not know what to do," but he ultimately decided to keep Ms. BPO as part of the defense team. However, Appellant declares that Mr. ST and Ms. BPO were "at odds" for the rest of the case.

Mr. ST's declaration states that "there was never a specific conversation with the King family regarding the firing" of Ms. BPO but that Dr. BS did not get along with her. Mr. ST declares "[t]here may have been an intense discussion concerning trial strategy but there was no recommendation to terminate" representation by Ms. BPO. In contrast, appellate defense counsel moved to attach a redacted email that Mr. ST had sent about a month before signing his declaration. This email states that the defense experts had urged Mr. ST to remove Ms. BPO after the April 2018 motions hearing but she "stayed on the team" because of the "insistence of Mr. King and the family."

Even if we resolve the above factual disputes in Appellant's favor, the error would not result in relief. *See Ginn*, 47 M.J at 248. Appellant argues that he did not receive conflict-free counsel for two reasons: (1) a financial conflict of interest because if he fired Ms. BPO he would have had to fire Mr. ST as they were in the same firm; and (2) a personal conflict because Mr. ST's new defense strategy was an attempt to cover up his lack of preparation. Appellant asserts we should presume prejudice under *Culyer v. Sullivan*, 446 U.S. 335, 349–50 (1980); *United States v. Lee*, 66 M.J. 387, 388–89 (C.A.A.F. 2008); and *United States v. Cain*, 59 M.J. 285, 295 (C.A.A.F. 2004). The Government disagrees that a presumption of prejudice arises when two attorneys from the same law firm representing a client are in conflict. We agree with the Government and find the cases cited above by Appellant are distinguishable and the CAAF's decision in *United States v. Saintaude*, 61 M.J. 175 (C.A.A.F. 2005), controls our resolution of this issue.[27] We address the distinguishable cases first.

---

[27] The parties also cite *United States v. Hale*, 76 M.J. 713 (N.M. Ct. Crim. App. 2017), *aff'd*, 77 M.J. 138 (C.A.A.F. 2017), on whether prejudice is presumed from a conflict of interest. The Government notes that *Hale* is not binding on us, but is "instructive, as it reviews a long line of military court cases, and the application of [*Cuyler*] in the military context." We agree that *Hale* provides a detailed and useful summary of the cases on this issue, including a discussion of *Saintaude* which we have found controlling. We need not and do not adopt the legal test in *Hale* for potential conflicts of interest. *See id*. at 722 (determining a potential conflict exists if the interests of an accused may place the defense counsel under inconsistent duties at some time in the future). Factually, in *Hale* the lead defense counsel's husband was a subordinate attorney rated by the lead trial counsel, a situation that is entirely different than the one before us.

*Culyer* is distinguishable as it addressed an actual conflict of interest where a defense counsel actively represented co-defendants which negated the unimpaired loyalty a defendant is constitutionally entitled to expect and receive from his attorney. 446 U.S. at 349, 352. *Lee* is also distinguishable as it involved a remand for additional fact-finding pursuant to *DuBay* where a detailed defense counsel had been reassigned to trial counsel duties, may have been a subordinate of the trial counsel prosecuting *Lee*, and questions existed on whether an informed decision was made to waive a conflict of interest. 66 M.J. at 389–90. *Cain* involved a military trial defense counsel who initiated a sexual relationship with his client, the appellant, during representation. 59 M.J. at 289. None of these cases resemble the alleged conflict before us.

In *Saintaude* one of the granted issues by the CAAF was whether Appellant was deprived of his right to conflict-free counsel when his counsel labored under mentally competing personal interests. 61 M.J. at 176. One of these interests was a disagreement in trial strategy between a military defense counsel and a civilian defense counsel that led the military defense counsel to file "a memorandum with the Regional Defense Counsel" asserting that the civilian defense counsel was "incompetent and intended to represent the accused in a manner that [was] ineffective and unprofessional." *Id*. at 177 (alteration in original). The memorandum "primarily criticized" the civilian defense counsel's "intent to focus" on "unsubstantiated allegations of unlawful command influence and command-level drug abuse." *Id*. at 177–78. The military defense counsel requested to either withdraw or for the civilian defense counsel to be decertified to practice in courts-martial. *Id*. at 178. The civilian defense counsel was not decertified, the military defense counsel did not request the military judge permit withdrawal, and none of the concerns were raised to the military judge or to the appellant. The CAAF noted the record did "not otherwise demonstrate" that the military defense counsel "was unsuccessful in properly focusing the efforts of the defense team." *Id*. at 181. The CAAF found the military defense counsel was not obligated to communicate the concerns about civilian defense counsel to the appellant absent evidence that he was unable to resolve them. *Id*. The CAAF analyzed this "potential conflict of interest" and determined "identification of a potential deficiency is not sufficient" under *Strickland* and "[t]o surmount the high hurdle presented by the second prong of *Strickland*, an appellant must demonstrate specific prejudice." *Id*. at 180. No prejudice was presumed.

In this case, the potential conflict about strategy is similar, and perhaps milder, when compared to *Saintaude*. We find that Appellant has not demonstrated specific prejudice even if Mr. ST undermined Ms. BPO by proposing a strategy change that she opposed and then suggested Appellant fire her. The record before us shows that any potential conflicts were resolved when Appellant rejected the proposed strategy, accepted a modified strategy of presenting

fewer witnesses, and decided that Ms. BPO would continue to represent him. The three attorneys executed this modified strategy and the record demonstrates they effectively worked together for the remainder of the trial. We see nothing in the record to support Appellant's contention that his counsel were so "at odds" with each other for the rest of the case that an actual or unresolved conflict of interest existed.

Similarly, any potential financial conflict of interest from Mr. ST and Ms. BPO being in the same firm was also resolved when Appellant decided that Ms. BPO would continue to represent him. Appellant's declaration explains why he decided to keep Ms. BPO and there is nothing in it to show that he was even aware of the possibility that releasing Ms. BPO could impact Mr. ST's representation of him.

It is true that the appellate filings and declarations address several issues that occurred after Appellant's trial such as legal fee disputes and Ms. BPO's departure from the firm. We considered whether any of them relate to the potential conflicts we have already addressed. To the extent that an actual conflict of interest developed later between Mr. ST and Ms. BPO, we conclude that it does not change our analysis of the above potential conflicts or our resolution that Appellant has not shown specific prejudice from deficient performance at trial from the three attorneys that represented him.

### c. Unprepared for Trial

Appellant and others declare that Mr. ST was unprepared for some portions of the trial. His opening statement is described as "rambling" and his closing argument on findings was a "dud" instead of the "fireworks" he promised. We explained the alleged deficiencies in the closing argument earlier. Appellant argues that Mr. ST took a weekend trip to New York after the Government rested its case and allegedly returned late from it, which negatively affected the preparation of defense witnesses and the closing argument. Finally, Appellant identifies three areas of the record where Mr. ST did not "cite caselaw or provide analysis for his arguments." These portions of the record relate to (1) whether "respect for women" was a relevant pertinent character trait in this case; (2) the illegal pretrial punishment motion addressed earlier; and (3) a request to reconsider a motion to suppress Appellant's statements to AFOSI.

Mr. ST declares that the entire defense team, including him, were "very thoroughly prepared." He agrees that he took a weekend trip to New York, but that he returned to New Jersey early Sunday morning, did various activities, and then met with the defense experts before meeting with Appellant and his family.

To the extent that there are factual disputes among the declarations on Mr. ST's level of preparation, relief would not result even if we resolve them in Appellant's favor. *See Ginn*, 47 M.J. at 248. We have said before that

> [t]here is no magic formula for determining how much time is needed to prepare for a criminal trial. A wide variety of factors, including things such as the experience and number of assigned counsel, nature and complexity of the charges, nature of the evidence, perceived defenses or lack thereof, and trial strategy all affect what must be done and how long it will take. The only true measure of whether trial preparation was adequate is the quality of counsel's performance at trial.

*United States v. Brown*, No. ACM 36607, 2008 CCA LEXIS 171, at \*25–26 (A.F. Ct. Crim. App. 23 Apr. 2008) (unpub. op.). Appellant has not demonstrated that Mr. ST's level of advocacy in the above areas fell "measurably below" that ordinarily expected of a "fallible" lawyer. *See Gooch*, 69 M.J. at 362. Even if we are incorrect in our assessment of Mr. ST's level of preparedness and performance, Appellant has not shown how any of these alleged deficiencies in preparation or execution had a reasonable probability of leading to a different result. Appellant does not identify a case that Mr. ST failed to use or an argument he failed to make because he was unprepared. Appellant was represented by three attorneys who challenged the Government's evidence and arguments extensively over a very lengthy trial conducted in sessions between 2 October 2017 and 1 August 2018. We cannot see how more preparation by Mr. ST or an earlier arrival at the Sunday preparation session with Appellant and his family before the Defense presented its case-in-chief reasonably would have secured a different outcome for Appellant on findings or sentence.

### d. Cohesive Defense Strategy

Appellant argues it is "patently unreasonable for *any* defense counsel, much less lead counsel, who is part of a team to deviate from a planned strategy the night before beginning the defense case without first discussing the deviation with the other team members." He argues the change in strategy resulted in Ms. BPO requesting a mistake of fact defense which was "completely at odds" with the defense that he "*never* performed oral sex" on JK. The Government asserts that Appellant (1) cited no legal standard about deviations from a planned trial strategy; (2) provided no evidence of the more aggressive defense strategy; and (3) received a robust defense with a clear theory of the case. We agree with the Government.

Appellant has not shown deficient performance from the decision to use the modified strategy. We will not second-guess this type of strategic decision whether made long before trial or modified after reflection and discussion

about the Government's case-in-chief. The modified strategy used was an objectively reasonable choice from the available alternatives. *See Akbar*, 74 M.J. at 379.

Additionally, we see no deficient performance from Ms. BPO initially requesting a mistake of fact instruction because this defense was arguably reasonably raised by the *Government's evidence*, specifically JK's testimony, just as Ms. BPO argued to the military judge. After a discussion with the military judge, Ms. BPO withdrew the request for the instruction and no mistake of fact instruction was given. This too was a reasonable decision by Ms. BPO after further review of the benefit of the proposed instruction. Under the circumstances where no instruction on mistake of fact was given Appellant has not demonstrated prejudice.

### e. Voir Dire of Lt Col SJ

Lt Col SJ sat as a panel member. In group voir dire, Lt Col SJ answered that she did not know Appellant and there was no reason she could not give Appellant a fair trial. Also in group voir dire, Lt Col SJ stated that she knew Appellant's squadron commander.

During individual voir dire, Lt Col SJ explained that she knew Appellant's squadron commander from staff meetings, but she had no personal interactions with him. Ms. BPO requested the military judge "inquire a bit further as to whether she has any familiarity" with Appellant. The military judge agreed and asked Lt Col SJ to construe his question "as broadly as you can" as to whether she had "any familiarity with the accused in this case." Lt Col SJ responded "I don't recognize the name. I don't recognize the accuser. If he's on JBMDL, I can't say that I've never maybe walked by him or seen him, but to my knowledge, I don't recognize him." After a delay in the case, Lt Col SJ and the other members who were previously empaneled were asked "have any of you heard anything about this trial for court-martial?" Lt Col SJ had a negative response.

According to Appellant, after individual voir dire of Lt Col SJ but during his trial, his former supervisor, Lt Col NG, arrived and watched part of the trial. Once this occurred, Appellant remembered that he had previously seen Lt Col NG and Lt Col SJ talking and laughing before and that they were friends. Appellant now suspected that Lt Col NG and Lt Col SJ had shared details about his situation and case previously. He declares that he informed his counsel about this, and he was told it was not a big issue and not to worry about it.

Before us, Appellant argues that a reasonable defense counsel would have sought to question Lt Col SJ in additional individual voir dire about whether she knew him and discussed his case with Lt Col NG. Appellant states his

counsel's failure to do so ensured "a potentially dishonest individual remained on the panel, an intolerable result for Appellant and the military justice system." Mr. ST did not recall being asked to conduct additional voir dire of Lt Col SJ. Ms. BPO does not mention being asked to conduct additional voir dire in either of her declarations.

The Government responds that Appellant has not demonstrated prejudice because he has failed to show that Lt Col SJ knew him or discussed his case given her statements under oath. We agree with the Government.

Appellant has not provided a declaration from Lt Col NG to show that he and Lt Col SJ discussed Appellant or his case or a declaration from any person who overheard them discussing his case. Appellant's suspicion that the two discussed his case before is pure speculation that is unsupported by the record and the declarations submitted. Appellant has not shown defective performance by his counsel not advocating that the military judge permit additional individual voir dire of Lt Col SJ. We see no reason for us to question Lt Col SJ's answers under oath during group and individual voir dire. Further, the military judge instructed during group voir dire that the members had a continuing duty to bring matters to the court's attention that might affect their impartiality. This included if the members realized any earlier answers provided were incorrect or incomplete. Lt Col SJ was present for this instruction and did not mention that she knew Appellant or discussed his case at any point during the trial. Appellant has not shown prejudice from his counsel not requesting additional voir dire of Lt Col SJ.

### f. Cross-examination of JK

Appellant argues that Ms. BPO's cross-examination of JK about the incident with her stepfather that resulted in a conviction bolstered JK's credibility. The Defense sought to cross-examine JK on this point from the outset but an adverse ruling under Mil. R. Evid. 412 prevented them from doing so. However, after JK testified during direct examination that she did not want to get Appellant in trouble, the Defense requested reconsideration and was allowed to ask one question on this topic which was, "But you knew that you had made a prior allegation against your stepfather that resulted in, [an] investigation, prosecution, and conviction by guilty plea, right?" JK answered, "Correct." Appellant argues now that by conducting this cross-examination in a case which rested on JK's credibility, the Defense showed she made a prior credible allegation against her stepfather and this "was devastating to the [D]efense." The Government disagrees. Ms. BPO in her first declaration notes that evidence of the prior allegation was part of the overall defense strategy and that Appellant was involved in the discussion about this strategy.

We find there was a reasonable explanation for the Defense seeking to cross-examine JK on the misconduct by her stepfather. The Defense's theory was that JK had lied about the accusations from the beginning for several reasons including to get away from Appellant's house and strict rules. When JK testified that she did not want to get Appellant in trouble, this contradicted the Defense's theory. The cross-examination showed JK knew that by making the complaint that she did against Appellant, from her past experience with her stepfather, the result could be an investigation and criminal prosecution. This knowledge supported the theory that JK fabricated the complaint to be free of Appellant and his strict rules. It does not matter that appellate defense counsel would have chosen a different approach and would not have sought to cross-examine JK on this one point. We decline to second-guess this strategic decision made by experienced trial defense counsel who consulted with Appellant on the matter.

Even if the decision to cross-examine on this point is deemed unreasonable, Appellant has not shown that the performance of Ms. BPO was measurably below that of a fallible lawyer. The Government objected to this line of cross-examination by the Defense during a closed session arguing it was irrelevant. The Government's objection on relevance grounds raises a question about how much this one area of inquiry bolstered JK's credibility. In closing argument on findings, the Government argued several times that JK did not want to get Appellant in trouble, but there was no argument that the incident with JK's stepfather had any bearing on her credibility or whether Appellant committed the charged offenses. The Defense's closing argument addressed the point of the cross-examination: "We have also provided evidence that she knew exactly what would happen upon [an] accusation, meaning there would be a criminal investigation and there would be a criminal prosecution because she had knowledge of going through that process before. And that is exactly what happened in this case." As we do not find deficient performance, we do not reach the question of prejudice by this line of cross-examination.

### g. Canceled Retention Bonus

Appellant claims that his counsel failed to identify a five-year, $25,000 per year, retention bonus that was canceled after JK's allegations as a grounds for illegal pretrial punishment. Appellant argues "not only did the canceled retention bonus on its own indicate pretrial punishment, it could have been utilized to paint an even broader picture to convince the military judge that the Government systemically punished Appellant in violation of Article 13, UCMJ."

Appellant has not shown a reasonable probability of this claim being found meritorious as a matter of law and fact, so the failure to pursue it is not error and certainly is not ineffective assistance of counsel. *See Terlep*, 57 M.J. at 349.

We find this issue warrants no further discussion or relief. *See Matias*, 25 M.J. at 361.

### h. Financial Loss of Retirement

Appellant had 17 years and two months of service when he was sentenced. When Appellant testified for the limited purpose of a pretrial motion, he was asked if he was undergoing a medical evaluation board (MEB) due to being on the mental health high-risk list for over a year. He responded, "I'm not sure exactly why I am going through an MEB," but he agreed that he was aware he was undergoing one. Appellant did not mention the loss of retirement pay or the possibility of a medical retirement during his unsworn statements during sentencing.

Based on the findings of the court, a dismissal was a mandatory minimum punishment for the sexual assault conviction. Prior to sentencing deliberations, the military judge instructed the court members that a punitive discharge "terminates the accused's status and the benefits that flow from that status, including the possibility of becoming a military retiree and receiving retired pay and benefits." During sentencing argument, Capt DA mentioned the loss of retirement when she stated "his military career has come to an end. The 17 years and the potential benefits that would've come in three years, those are all gone. And that punishment of a [d]ismissal is life-long."

Before us, Appellant claims the failure to argue the specific dollar loss of retirement benefits was ineffective. He also claims the failure to argue the "known loss of medical retirement" was ineffective under *United States v. Easterly*, 79 M.J. 325 (C.A.A.F. 2020). We disagree with both claims and find no deficient performance as there were reasonable explanations for the decisions that were made.

It was reasonable for the Defense to not present the specific dollar loss of retirement because the dismissal in this case was mandatory and the panel consisted of one colonel and four lieutenant colonels who would understand the value of the loss of retirement benefits without more. In *United States v. Caldwell*, No. ACM 33015, 1999 CCA LEXIS 215, at *6–7 (A.F. Ct. Crim. App. 27 Jul. 1999) (unpub. op.), our court said "to think that [senior officers] had no idea of the value of a [lieutenant colonel's] retirement benefits is ludicrous. This is not the stuff of which ineffective assistance of counsel is made." In *Caldwell*, the dismissal was not a mandatory minimum sentence, but here it is, which makes the decision of defense counsel even more reasonable. There is no question in our mind that the experienced officers who sentenced Appellant knew the value of a retirement if Appellant had reached the mark of 20 years of honorable service.

It was also reasonable for the Defense not to present sentencing evidence on a medical retirement. The record shows that Appellant was undergoing a MEB during the time of motion practice. Appellant has not presented us documentation that, at the time of his sentencing, the Secretary of the Air Force had approved a permanent disability retirement under 10 U.S.C. § 1201. We do not even have a Formal Physical Evaluation Board recommendation for a disability retirement in the record of trial as was available to the CAAF in *Easterly*. 79 M.J. at 326.[28] The best information Appellant has provided us on medical retirement is an email from Mr. ST to SK dated 13 January 2020, more than five months after Appellant was sentenced, that shows that Mr. ST remembered seeing an email that indicated Appellant was found "medically unfit and recommended for medical retirement." A vague reference in one email that Mr. ST received is insufficient to show that counsel performed deficiently. Appellant has not demonstrated he had an approved medical retirement at the time of his sentencing. He has also not demonstrated how his conviction for sexual assault and his mandatory minimum dismissal would affect a "recommendation" for medical retirement. Finally, even if counsel's performance was somehow deficient, we see no prejudice when the mandatory minimum sentence was a dismissal and there is only speculation that the members would have reasonably adjudged less confinement if they received evidence of a "recommendation" for medical retirement.

### i. Cumulative Effect

Appellant argues we should view the totality of the circumstances and conduct a cumulative-error analysis of the effect of his counsel's performance even if individual oversights or missteps did not independently rise to that level. *See Akbar*, 74 M.J. at 392 (citation omitted). We have done so and find an insufficient basis for establishing ineffective assistance based on cumulative error.

## G. Victim Impact Statement

### 1. Additional Background

During presentencing, JK delivered oral and written unsworn statements to the court members which were substantially the same. Trial defense counsel raised no objection to either statement.

---

[28] The CAAF in *Easterly* clarified that a military judge instructs on the effect of a punitive discharge on all forms of retirements when there is both an actual evidentiary predicate for the instruction and a request by a party for it. 79 M.J. at 328. Appellant does not claim his counsel performed deficiently by not requesting an instruction from the military judge on disability retirement.

Before us, Appellant argues that there are four matters that are outside the definition of victim impact from R.C.M. 1001A: (1) the circumstances of how Appellant's parents became JK's "guardians" after she reported Appellant and went to live with his parents in Montana;[29] (2) statements made by Appellant's parents to JK about the impact of her allegations on Appellant, SK, and JK's half-siblings; (3) the circumstances of how JK was later placed in foster care while in Montana; and (4) the effect of delays in the court-martial process on JK. Appellant argues these four matters were, at best, indirectly caused by him. Specifically, he asserts (1) it was SK, not him, who decided that JK would live with his parents in Montana; (2) he had no control over what his parents told JK when she lived with them; (3) he had no control over the decision that led to JK being placed in foster care; and (4) he had no control over the scheduling of his court-martial. On the fourth point, Appellant argues the reference to court-martial delays implicated his constitutional right to plead not guilty and the Government's requirement to prove its case against him beyond a reasonable doubt. Appellant asserts he was prejudiced because JK's unsworn statements were material to the Government's sentencing case and the trial counsel's recommendation for a 15-year confinement term.

The Government argues that we should assess whether the impacts on JK directly related to or arose from the offense by considering how foreseeable the harm is in the light of the offense. Following this approach, the Government argues that Appellant sexually assaulted his minor daughter, of whom he had legal custody, and it was foreseeable that she would be removed from his care. Further, it would have been foreseeable that the family would "take sides," and it was Appellant who directly caused the family rift. The Government argues that the first three matters Appellant claims were erroneously allowed were foreseeable. On the fourth matter, the Government asserts that JK did not improperly address delays in the court-martial and that no plain error exists. The Government quotes JK's unsworn statement in support of this position: "I could talk about all the other effects this had on my life, like the many court delays and how this has been hard on me . . . . "

### 2. Law

Article 6b, UCMJ, grants victims of offenses under the UCMJ the right to be reasonably heard at a sentencing hearing related to the offense. 10 U.S.C.

---

[29] In the unsworn statements, JK stated that she was told Appellant's parents were her "guardians" when she went to live with them in Montana. AFOSI agents used similar terminology when cross-examined as government findings witnesses. We use the term "guardian" in this opinion generically as it is used in the record of trial and this assignment of error, but note that there is nothing before us to show a New Jersey or Montana court named either of Appellant's parents as guardians of JK.

§ 806b(a)(4)(B). A victim covered by this right is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense under [the UCMJ]." 10 U.S.C. § 806b(b).

Under R.C.M. 1001A, victims in non-capital cases may exercise their right to be reasonably heard through sworn or unsworn statements. R.C.M. 1001A(b)(4)(B). Unsworn statements may be oral, written, or both. R.C.M. 1001A(e). A "crime victim" is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty." R.C.M. 1001A(b)(2).

Statements offered under R.C.M. 1001A "may include victim impact or matters in mitigation." R.C.M. 1001A(c). Victim impact under R.C.M. 1001A means "any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

"Interpreting R.C.M. 1001A is a question of law, which we review de novo." *United States v. Barker*, 77 M.J. 377, 382 (C.A.A.F. 2018) (citation omitted).

"R.C.M. 1001A 'belongs to the victim, and is separate and distinct from the [G]overnment's right to offer victim impact statements in aggravation under R.C.M. 1001(b)(4).'" *United States v. Tyler*, 81 M.J. 108, 111 (C.A.A.F. 2021) (quoting *Barker*, 77 M.J. at 378). "[U]nsworn victim statements are not made under oath, and are thus not evidence." *Id*. at 112. "Although the unsworn victim statement is not subject to the Military Rules of Evidence, this does not mean that the military judge is powerless to restrict its contents." *Id*. "[T]he military judge has an obligation to ensure the content of a victim's unsworn statement comports with the parameters of victim impact or mitigation as defined by R.C.M. 1001A." *Id*.

"While the military judge is the gatekeeper for unsworn victim statements, an accused nonetheless has a duty to state the specific ground for objection in order to preserve a claim of error on appeal." *Id*. In the absence of an objection at trial, we review claims of erroneous admission of a victim unsworn statement for plain error, where an appellant must show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *Erickson*, 65 M.J. at 223 (citations omitted). R.C.M. 1001(g) reads: "After introduction of matters relating to sentence under this rule, counsel for the prosecution and defense may argue for an appropriate sentence." "[E]ither party may comment on properly admitted unsworn victim statements" during presentencing argument. *Tyler*, 81 M.J. at 113.

When there is error regarding the presentation of victim statements under R.C.M. 1001A, the test for prejudice "is whether the error substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (quoting *United States v.*

*Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). This is determined by evaluating the relative strength of the parties' cases along with the materiality and quality of the evidence in question. *Id*. (citation omitted). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Id*. (citation omitted).

### 3. Analysis

As a threshold matter, we decline to adopt the Government's approach of using foreseeability to determine whether JK's unsworn statement exceeded the scope of R.C.M. 1001A. Instead, we will apply the plain language of R.C.M. 1001A(b)(2) which defines victim impact as "any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." Additionally, we must determine whether Appellant has met his burden of showing each of the three prongs of the plain error standard of review as there was no objection at trial to these matters. We find Appellant has not met his burden to show plain error.

Appellant argues the first three matters were improper under R.C.M. 1001A because he had no "control over" the things that SK and his parents did. We reject this "no control" argument as it has no basis in the text of R.C.M. 1001A(b)(2).

On the first matter—regarding Appellant's parents becoming JK's "guardians"—JK told the court members "not too long after the assault" she received "a text message in [her] last class of the day" from SK that JK "needed to be picked up by [her] grandparents and flown to Montana that night." When Appellant's parents showed up they told JK "they were now [her] guardians" and that SK "had essentially given [her] up." JK asked "why" and was told that SK was scared of her. JK explained her initial reaction to this information and her view of it at the time of the unsworn statement. We see no error, let alone plain error, in JK explaining the social and psychological impact she felt when it was decided that she would have to move to Montana on short notice and live with Appellant's parents. We also see no plain or obvious error in JK's describing her current feelings on this matter at the time of the unsworn statement. JK's living situation changed because of the sexual assault allegation, an offense of which Appellant was convicted. It does not matter that the decisions on JK's living arrangements were made by someone other than Appellant. The decisions made about JK's living arrangements were directly related to or resulted from the sexual assault.

We turn to the second matter—the statements that Appellant's parents made to JK while she lived with them in Montana and JK's reactions to them— and reach the same conclusion. JK stated in her unsworn statements that she

"cried a lot in Montana when [her] grandparents would tell [her] in great detail what [her] siblings and dad and [SK] were suffering through *because* [she] *had reported the assault.*" (Emphasis added). JK then described the details of what she was told and how she reacted. Appellant has not persuaded us that it was plain or obvious error for this information to be allowed in her unsworn statement. The unsworn statement connected the statements of Appellant's parents directly to JK's decision to report the sexual assault and then merely recounted JK's social and emotional impact from hearing these statements. We note that a victim impact statement under R.C.M. 1001A does not allow "a never-ending chain of causes and effects" to be relayed to the sentencing authority. *See United States v. Dunlap*, No. ACM 39567, 2020 CCA LEXIS 148, at *20 (A.F. Ct. Crim. App. 4 May 2020) (unpub. op.) (citation omitted), *rev. denied*, 80 M.J. 347 (C.A.A.F. 2020). However, the language that JK used directly connected the comments of Appellant's parents to the reporting of the sexual assault. Appellant has not met his burden to show plain or obvious error.

The third matter Appellant raises is a reference by JK on why she was placed in foster care in Montana after she lived with Appellant's parents. We note that JK's findings testimony briefly touched on her living with foster parents in Montana but did not include any explanation on why this had occurred. In her unsworn statement, JK stated

> As I stayed in my grandparents' house and this case moved forward, tensions rose, and things hit a breaking point with my family. My grandparents didn't want me in the home anymore and I was placed into foster care. It didn't hurt to make this move. And honestly, I felt relieved I would be getting away from my family because it was hard to be in a house where no one believed me.

JK connected her placement in foster care to the case against Appellant and impliedly the sexual assault. JK also described moving into foster care as a positive event as it brought an end to the negative social and emotional impact of having to live with Appellant's parents who did not believe that Appellant sexually assaulted her. We see no plain or obvious error from JK explaining to the court members how and when her social and emotional impact from living with Appellant's parents ended. Even if it was plain or obvious error to allow these statements under R.C.M. 1001A(b)(2), we discern no material prejudice to Appellant's substantial rights. The court members already knew that JK had been placed in foster care and could easily deduce that Appellant's family did not believe JK from the other evidence presented during findings and sentencing. The only thing the members learned from these few sentences in JK's unsworn statement was that JK felt relief by being placed into foster care rather than suffering further social or emotional harm from that process.

We now assess the fourth matter—JK's comment about "the many court delays" and how these had been hard on her. It is important to note that JK refrained from describing the specifics of how court delays impacted her except, in passing, to say that they had been hard. JK also made no express mention of Appellant's right to plead not guilty and did not attribute the cause of delays to Appellant.

The issue of court-martial delays was also well-known to the panel that sentenced Appellant. Three of the court members originally empaneled were aware of a several-month delay between their voir dire and the trial on the merits and these members received instructions from the military judge about this "extended adjournment, which is not typical, not something that is done frequently." The later detailed court members went through voir dire knowing there were three absent court members after being told by the military judge about "a previous hearing" and those absent court members were "still on the panel" but "not present." At the first session with all court members, the military judge questioned the three members from the prior session in front of the others to ensure they had not heard anything about the trial since they last appeared and that they complied with the previous military judge's instructions. All of the court members who sentenced Appellant knew there was an extended lunch break of almost three hours between JK's direct examination and her cross-examination during findings. Upon return from this "extended lunch hour" the military judge instructed the court members not to speculate as to why it was needed but to know the military judge decided "there was additional work on this case" that "needed to be completed outside of [the members'] presence."

Given the above circumstances, we conclude that before JK's unsworn statement the court members knew that some delays had occurred during the case. They also received a specific instruction that one particular delay, during JK's testimony, was something the military judge decided was needed and they should not speculate why it occurred. With this backdrop, even if we assume *arguendo* that it was plain or obvious error for JK to comment on court-martial delays being hard on her, we discern no material prejudice to Appellant. JK provided no specifics and did not assert or imply that Appellant should bear the responsibility for any of the delays.

We decline to specify the exact contours of when a crime victim may comment about delays in a court-martial case in an unsworn statement. We explicitly stated in *United States v. Roblero* that "Article 6b is not a blanket authorization for a victim to state to the sentencing authority whatever he or she might desire." No. ACM. 38874, 2017 CCA LEXIS 168, at *18 (A.F. Ct. Crim. App. 17 Feb. 2017) (unpub. op.). Military judges should remain cognizant that

a crime victim's comment about a court-martial delay could be wrongfully interpreted by the court members. Here, the military judge issued a proper instruction when there was a several-hour delay before JK's cross-examination to avoid any possibility that the court members could hold Appellant or his counsel responsible for that delay. We note that the victim unsworn statement instruction could have been similarly tailored if the military judge determined JK was allowed to comment on her right to proceedings free from unreasonable delay under Article 6b(a)(7), UCMJ, while ensuring court members "do not wrongly interpret victim impact information that they 'must consider.'" *United States v. Da Silva*, No. ACM 39599, 2020 CCA LEXIS 213, at *54 (A.F. Ct. Crim. App. 25 Jun. 2020) (unpub. op.) (addressing a victim's unsworn statement which could be reasonably interpreted by the court members as a comment about an acquitted offense).

Assuming *arguendo* that Appellant demonstrated a plain or obvious error, we are convinced that JK's reference to court delays being hard did not substantially influence the adjudged sentence. We have evaluated the relative strength of the parties' sentencing cases and find that, although there are strengths and weaknesses in each, the manner in which the offense was committed was aggravating given the location and the presence of Appellant's family upstairs. Regarding the materiality and quality of this matter, we note that the reference to court delays was made during an unsworn victim impact statement, and the military judge instructed the members on the use of an unsworn statement immediately after JK read her statement. Specifically, the military judge instructed that the statement was not under oath and that the weight and significance of it rested with the sound discretion of each of the members. The quality would have been higher if admitted as sworn testimony or part of the Government's evidence in aggravation. We also see no reference to JK's comment about court delays in trial counsel's sentencing argument which suggested a confinement term of 15 years would be appropriate. Under these circumstances, if Appellant demonstrated a plain or obvious error existed, we conclude that JK's brief reference to court delays being hard did not substantially influence the adjudged sentence.

## H. Post-Trial Confinement Conditions

### 1. Additional Background

#### a. VWAP Enrollment

After Appellant's trial concluded, the legal office at JBMDL prepared DD Form 2704s, *Victim/Witness Certification and Election Concerning Prisoner Status*, because Appellant was sentenced to confinement. This form is used to inform victims and witnesses of changes in status for an incarcerated person such as the scheduling of a clemency or parole hearing or a transfer to another

confinement facility. *See* Air Force Instruction (AFI) 51–201, *Administration of Military Justice*, ¶ 16.26.4 (18 Jan. 2019). Despite the use of the word "witness" in the title of the form, the form's instructions specify it shall be used for "appropriate witnesses (those who fear harm by the offender)." For purposes of the VWAP, the Air Force has defined the term "witness" to not include a "defense witness." AFI 51–201, ¶ 16.4.

The Government concedes that members of Appellant's "family" were "erroneously entered" into the VWAP. We granted Appellant's unopposed[30] motion to attach declarations of SK and Appellant's sister, father-in-law, brother-in-law, and friends Lt Col DM[31] and Major (Maj) JS. Three of the declarants—SK, Lt Col DM, and Maj JS—testified as witnesses for the Defense in findings and two more—Appellant's sister and brother-in-law—testified for the Defense in sentencing. It is obvious from the declarations that Appellant's family and his friends were erroneously provided DD Form 2704s. Additionally, none of them were told that by signing the form that a military confinement facility would prohibit them from contacting Appellant.[32]

After the court-martial adjourned, Appellant was confined at a jail in Burlington County, New Jersey. On 20 August 2018, he was transferred to the Naval Consolidated Brig in Miramar, California. After the transfer, Appellant was permitted to briefly call SK. Thereafter, their communications were cut off because of the VWAP form SK had signed. SK attempted to restore her communications with Appellant by working with Naval Brig's victim witness coordinator. According to SK it took 34 days before she could communicate with Appellant.

The other declarants listed above were also prohibited from communicating with Appellant after his transfer to military confinement. According to Maj JS, only Appellant's mother, who did not sign a DD Form 2704 and was not present when the others signed DD Form 2704s, was still able to contact Appellant.

---

[30] The Government objected to one declaration, from one appellate defense counsel, but it did not involve this assignment of error. As Appellant's lack of contact with his family and friends was raised during clemency, we understand that we are permitted to consider declarations from outside the record of trial when necessary to resolve issues raised by materials in the record of trial. *See Jessie*, 79 M.J. at 442–44.

[31] Lt Col DM was a major (O-4) at the time of the trial.

[32] On 7 September 2018, SK received a letter from the Air Force with an attached DD Form 2705 notifying her of Appellant's transfer. The letter contained the following statement: "**Inmates are not allowed to contact a victim or witness.** Also, if you testified for defense on behalf of the inmate, you should not be in this program." The letter advised SK that a written request was required for her to be removed from the VWAP.

Maj JS's lack of communication with Appellant lasted at least six weeks. Lt Col DM's lack of communication with Appellant lasted about two months. Lt Col DM and his wife sent Appellant approximately six letters, all of which were returned unopened. The Government has not disputed the accuracy of these declarations. Therefore, we will accept as accurate the lengths of time that each individual was prohibited from contacting Appellant.

As part of his clemency submission, Appellant notified the convening authority that the Naval Brig denied him visitation and contact with his family members and friends because those individuals were "listed as a witness on the DD Form 2704." The clemency submission described the efforts taken to remedy this situation. While Appellant did not submit a complaint under Article 138, UCMJ, 10 U.S.C. § 938, he did retain Ms. BPO to represent him in resolving the concerns with the Brig. On 13 November 2018, Ms. BPO signed a letter to the Naval Brig's commanding officer which addressed the denial of contact and requested further information and invited a discussion with the commander or his legal advisor. At the time of Ms. BPO's letter, for some unexplained reason, SK was again prohibited from contacting Appellant even though communications had been allowed earlier. The declarations, including Appellant's, describe the difficulties each person endured because of this lack of contact.

Appellant's Eighth Amendment and Article 55, UCMJ, arguments are that the Government's actions wrongly deprived him of a health and safety necessity when he was prohibited from communicating with his loved ones. Appellant urges us to consider such communications essential under an evolving standard of decency. In Appellant's view, the Government's conduct shows a sufficiently culpable state of mind that was either knowingly imposed or showed a deliberate indifference. Alternatively, Appellant requests we use our Article 66(c), UCMJ, authority to reduce his sentence by 204 days to account for the Government's unnecessary infliction of emotional suffering and financial suffering. The latter is demonstrated as the family had to hire Ms. BPO to restore contact.

The Government argues that prohibitions on outside contact are not a denial of necessities. It also argues that Appellant has not shown that officials acted with a culpable state of mind and that Appellant "at best" has demonstrated negligence. The Government also notes that Appellant did not petition for relief under Article 138, UCMJ. Regarding our Article 66(c) authority, the Government states we should decline to grant relief given the legitimate penal interests in prohibiting contact with those in the VWAP and because the situation was remedied. The Government provided us no declarations from legal office personnel to explain how or why defense witnesses were enrolled in the

VWAP or from confinement officials to explain why the Government took so long to remedy its error.

### b. No Contact with Minor Children

Appellant's clemency request also addressed the Naval Brig's policy that prohibited him from having any contact with his three minor children. According to Appellant, he could not contact his children between 20 August 2018 and February 2019 and that the prohibition took a devastating emotional toll on SK, the children, and him. Appellant argues that the Naval Brig's policy infringed on his constitutional right to parent his minor children and that it was invalid as it was not reasonably related to a legitimate penological interest. Appellant requests sentence relief by not affirming the dismissal or more than five months of confinement.

On 11 January 2016, the commanding officer, Naval Consolidated Brig Miramar, signed a three-page memorandum on contact between minors and prisoners convicted of offenses that have a sexual component involving a minor under the age of 18. We granted Appellant's motion to attach a copy of the memorandum which stated the policy was created "through direct consultation with expert leaders in the field of sex offender management" and was "in accordance with generally accepted practices." The policy was "intended to consider the rehabilitative interests of the prisoners, provide broad protection for minors, and to be in the best long-term interest of the family." The policy states: "Any direct and/or indirect contact with a family member who is a minor under the age of 18 will be rare and must be specifically authorized by the Commanding Officer." The factors that will be considered "in these rare exceptions" include "clear clinical indication as determined by the Sex Offender Treatment Program (SOTP) team, a solid family reunification plan is in place, and an outside therapist for the victim supports the clinical utility of contact."

The policy indicates that authorization will be considered "individually" and that a prisoner not enrolled in the SOTP (with a Clinical Services determination that he/she is low-risk of reoffending and with no required treatment) may request visitation without a full sex offender evaluation. Appellant provided us a 23 August 2018 memorandum signed by the SOTP Assessment Director at the Naval Brig which determined he was "low risk" and was not recommended for the SOTP. Finally, the policy established that "a written request" from the prisoner must be routed to the commanding officer via the "VWAP Coordinator, Clinical Services Director, Technical Director, and Executive Officer." The prisoner's written request has to identify the minors, their guardians, and the nature of the relationship. Additionally the request must include a "description of the type of contact requested (i.e., phone, letters, visitation or combination of the three)." Appellant has not provided us any written

requests for contact that he submitted to the Naval Brig or any grievances he personally filed using the prison's grievance system.

The Government argues that we should decline to assess the constitutionality of the Naval Brig's policy on contact with minor children. If we do assess the claim, the Government argues that Appellant did not exhaust his administrative remedies and that the Naval Brig's policy is constitutional because it is rationally related to legitimate government interests. The Government has provided us no declarations or records to explain how it applied its minor contact policy to Appellant while he was confined at the Naval Brig.

### c. Denial of Medications

According to Appellant, at the time of his trial, he was prescribed four medications which he took on a daily basis. Appellant states those medications were packed in his confinement bag. Appellant declares that the Burlington County jail's psychiatrist denied his request for these prescribed medications during his initial 72-hour isolation period which caused him to suffer from *inter alia* migraines, vomiting, and the "shakes" for two straight days. After his isolation period ended, according to Appellant, he again requested his medications and the jail psychiatrist denied his request. Appellant told SK about the denials and she sought the assistance of Appellant's military mental health provider who contacted the jail's psychiatrist. Thereafter, Appellant received sporadic and lower doses of two of the four medications but still experienced severe migraines and nausea.

Upon his transfer to the Naval Brig, Appellant asserts that he was precluded from taking his medications for at least three days while he awaited an appointment with the Brig's psychiatrist. He states that he began to re-experience withdrawal symptoms. After about a week, Appellant states that he was restarted on three of the four medications. Appellant provided us medical records covering the time period of 20 August 2018 until 27 August 2018, his first week at the Naval Brig. The records from 20 August 2018 show that Appellant "arrived" with two medications in "handmade paper envelopes" sealed with staples and the printed label placed on each did not match the medications inside. The records from this date also reflect that one of Appellant's prescriptions was expired. On 27 August 2018, the records show that a medical provider performed "medication reconciliation" based on how the medications were packaged on arrival. This provider noted that Appellant's medications would be held until his appointment with the Brig's psychiatrist.

Appellant argues the denial of medications by both facilities constituted cruel and unusual punishment. Alternatively, he requests we provide sentence relief under Article 66(c), UCMJ, as it was unnecessarily harsh and risky to deny him access to the prescribed medications, and he suffered physically,

mentally, and emotionally because of it. Appellant concedes that he did not raise the issue with his military commander or file a petition under Article 138, UCMJ. He argues he had no access to his chain of command during his isolation period in Burlington County's jail, his command did not visit him for the first two weeks he was confined at the jail, and he did not believe that his commanding officer wronged him because he was confined in a civilian jail. Appellant also claims filing an Article 138 petition would have been fruitless as his civilian confinement was temporary and he knew he would soon be transferred to the Naval Brig.

The Government responds that Appellant has failed to show a culpable state of mind on the part of prison officials, failed to exhaust the prisoner grievance system, and failed to petition for relief under Article 138, UCMJ. The Government also notes that Appellant did not identify any denial of medications in his clemency submission to the convening authority. The Government provided us no declarations or documents from either confinement facility.

Appellant makes several arguments in reply and claims the denial of medications was raised before the convening authority during clemency though Appellant fails to cite which portion of the clemency petition addressed this issue.

### 2. Law

We review de novo whether an appellant has been subjected to impermissible conditions of post-trial confinement in violation of the Eighth Amendment[33] or Article 55, UCMJ, 10 U.S.C. § 855. *United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001)).

Both the Eighth Amendment and Article 55, UCMJ, prohibit cruel and unusual punishment. In general, we apply "the [United States] Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, except in circumstances where . . . legislative intent to provide greater protections under [Article 55]" is apparent. *United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F. 2000) (citation omitted). "[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976)). As the Supreme Court has explained, "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones."

---

[33] U.S. CONST. amend. VIII.

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

A violation of the Eighth Amendment is shown by demonstrating:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [appellant]'s health and safety; and (3) that [appellant] "has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ, 10 U.S.C. § 938 [2000]."

*Lovett*, 63 M.J. 211, 215 (third alteration and omission in original) (footnotes omitted) (quoting *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997)).

Under Article 66(c), UCMJ, we have broad authority and the mandate to approve only so much of the sentence as we find appropriate in law and fact and may, therefore, grant sentence relief, without finding a violation of the Eighth Amendment or Article 55, UCMJ. *See United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016); *see also United States v. Tardif*, 57 M.J. 219, 223 (C.A.A.F. 2002). In considering Article 66(c)-based claims, we have declined to require appellants to demonstrate they have previously exhausted administrative remedies prior to seeking judicial relief. *See United States v. Henry*, 76 M.J. 595, 610 (A.F. Ct. Crim. App. 2017). We instead consider the entire record and typically give "significant weight" to an appellant's failure to exhaust those remedies before requesting judicial intervention. *Id*. "While we have granted sentence relief based upon conditions of post-trial confinement where a legal deficiency existed, we are not a clearing house for post-trial confinement complaints or grievances." *United States v. Ferrando*, 77 M.J. 506, 517 (A.F. Ct. Crim. App. 2017) (citation omitted). "Only in very rare circumstances" do we exercise our Article 66(c) authority to grant sentence relief based upon conditions of post-trial confinement when there is no violation of the Eighth Amendment or Article 55, UCMJ. *Id*. (citations omitted).

A CCA "cannot ignore an appellant's claims that a prison policy rendered an approved sentence incorrect in law even if that claim does not invoke the protections afforded under the Eighth Amendment." *United States v. Guinn*, ___ M.J. ___, No. 19-0384, 2021 CAAF LEXIS 439, at *14 (C.A.A.F. 10 May 2021) (citations omitted). In reviewing prison policies, "[c]ourts should show deference to prison administrators because 'the "problems of prisons in America are complex and intractable," and because courts are particularly "ill equipped" to deal with these problems.'" *Id*. at *16 (quoting *Shaw v. Murphy*, 532 U.S. 223, 229 (2001)). "[I]f an appellant claims that post-trial confinement

conditions unlawfully increased the severity of the sentence, a CCA *must consider* whether the sentence is correct in law." *Id*. at *11–12. We have "broad discretion" to determine whether relief is actually warranted in a specific case. *Id*. at *16 (citing *United States v. Baier*, 60 M.J. 382, 385 (C.A.A.F. 2005)). Article 66(c), UCMJ, "empowers the CCAs to 'do justice,' with reference to some legal standard, but does not grant the CCAs the ability to 'grant mercy.'" *Id*. at *18 (quoting *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010)).

> [I]t still remains the case that "[a]n appellant who asks [a CCA] to review prison conditions . . . must establish" the following: (1) a record demonstrating exhaustion of administrative remedies (i.e. exhaustion of the prisoner grievance system and a petition for relief under Article 138, UCMJ, 10 U.S.C. § 938 (2012), except in "unusual or egregious circumstances that would justify [the] failure" to exhaust); (2) "a clear record demonstrating . . . the jurisdictional basis for [the CCA's] action"; and (3) "a clear record demonstrating . . . the legal deficiency in administration of the prisoner."

*Id*. at *18–19 (alterations and omissions in original) (quoting *United States v. Miller*, 46 M.J. 248, 250 (C.A.A.F. 1997)) (additional citation omitted).

A prison regulation that infringes on constitutional rights is valid only if it is reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Courts "must take cognizance of the valid constitutional claims of prison inmates . . . 'when a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.'" *Id*. at 84 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974)). The burden is on the prisoner to disprove the validity of a prison regulation. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (citations omitted). The Supreme Court has said that "the Constitution protects 'certain kinds of highly personal relationships.'" *Id*. at 131 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618–20 (1984)). The Supreme Court has discussed a "right to maintain certain familial relationships, including association among members of an immediate family" in an "outside the prison context." *Id*. (citing *Moore v. East Cleveland*, 431 U.S. 494 (1977) (plurality op.); *Meyer v. Nebraska*, 262 U.S. 390 (1923)). It has also described a guaranteed liberty interest in the "right of an individual" to "bring up children." *Meyer*, 262 U.S. at 399.

A four-prong test must be used to determine whether a prison policy that infringes on constitutional rights is reasonably related to legitimate penological interests: (1) whether "a 'valid, rational connection' exists [between] the prison regulation and the legitimate governmental interest" advanced as its justification; (2) whether "alternative means of exercising the right remain

open to [prisoners];" (3) "the impact accommodation of the asserted constitutional right will have on guards, other [prisoners], and on the allocation of prison resources generally;" and (4) the absence or "existence of obvious, easy alternatives" that would accommodate the prisoner's rights at *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 89–91.

"Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner." *Bazzetta*, 539 U.S. at 131. "[F]reedom of association is among the rights least compatible with incarceration." *Id.* (citations omitted). "Some curtailment of that freedom must be expected in the prison context." *Id.* In *Bazzetta*, the Court stated, "We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners." *Id.* The Court also declined to "explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations [at issue bore] a rational relation to legitimate penological interests." *Id.* at 132.

### 3. Analysis

#### a. VWAP Enrollment

There is little question that the legal office personnel erred by enrolling Appellant's family and friends in the VWAP. No reasonable legal office member could have concluded that these individuals should have been enrolled in the VWAP program, even if the individuals signed the enrollment forms. The actions contradicted established policy and were negligent. This does not mean that an Eighth Amendment or Article 55, UCMJ, violation has occurred by prison officials at the Naval Brig. We must examine whether Appellant has met the three *Lovett* factors. *See* 63 M.J. at 215. We find Appellant failed to meet the second and third *Lovett* factors, so we do not decide whether Appellant has shown a denial of necessities. *See id.*

Regarding the second *Lovett* factor—a culpable state of mind on the part of prison officials amounting to deliberate indifference to Appellant's health and safety—Appellant has not met his burden. The documentation provided by Appellant shows the Naval Brig's VWAP coordinator provided assistance in resolving this issue and apologized for the delay, at least to SK. While a two-month delay to resolve an error created by the Air Force legal office seems excessive to us, we see no proof of intent to punish and no deliberate indifference to Appellant's health and safety by confinement officials. We also considered that SK's contact was restricted a second time around 12 November 2018 after she made a written complaint on 7 November 2018 to the commanding officer about the minor contact policy. Appellant has not shown that confinement officials retaliated against him because of SK's written complaint, and therefore

we see no culpable state of mind of prison officials. It is insufficient for Appellant to demonstrate an Eighth Amendment and Article 55 violation by noting the lack of contact.

Appellant has also failed to meet the third *Lovett* factor because he did not exhaust his administrative remedies using the prisoner grievance system and he did not petition for relief under Article 138, UCMJ. If Appellant had taken these actions, we undoubtedly would have a more complete record developed to aid our appellate review. Prior to trial adjourning, Judge Speranza confirmed Appellant was advised, in writing, of his post-trial and appellate rights. That document, signed by Appellant and his military defense counsel, was marked as an appellate exhibit and addressed the need to exhaust administrative remedies for post-trial confinement complaints. He was specifically advised that the administrative remedies included (1) "submitting a complaint to the confinement facility (preferably in writing)" and (2) "filing a complaint with the commander who ordered your confinement under Article 138, UCMJ." We see no unusual or egregious circumstances that justify the failure to exhaust administrative remedies.

In considering this claim under our Article 66(c), UCMJ, authority, Appellant does not have to previously exhaust his administrative remedies but instead we consider the entire record and give "significant weight" to his failure to do so prior to seeking judicial relief. *See Henry*, 76 M.J. at 610. We consider this a close call. We are troubled by the actions of legal office personnel who handled the VWAP paperwork in this case. We are dismayed that the military prison officials seemed to lack a sense of urgency to resolve this matter once they were aware of it. However, we cannot say that Appellant's sentence was unlawfully increased after giving significant weight to Appellant's failure to file either a grievance with prison officials or a petition under Article 138, UCMJ, to his Air Force commander who ordered confinement. Accordingly, this is not one of those "very rare circumstances" where we will exercise our Article 66(c) authority to grant sentence relief based upon conditions of post-trial confinement without an Eighth Amendment or Article 55, UCMJ, violation. *See Ferrando*, 77 M.J. at 517.

### b. No Contact with Minor Children

This is not the first time our court has reviewed a constitutional challenge to a Naval Consolidated Brig Miramar policy on contact between certain pris-

oners and minors. In *United States v. Green*, our court addressed First Amendment,[34] Fifth Amendment,[35] Eighth Amendment, and Article 55, UCMJ, challenges when the appellant was not permitted to contact his 17-year-old sister while confined after a conviction for possession, receipt, and display of visual depictions of a minor engaged in sexually explicit conduct. No. ACM 36664, 2007 CCA LEXIS 475, at *1–2 (A.F. Ct. Crim. App. 12 Oct. 2007) (unpub. op.).[36] In *Green*, our court rejected the Eighth Amendment and Article 55, UCMJ claims determining that (1) the complaint did not amount to a serious act or omission resulting in a denial of necessities; (2) the appellant had not shown the commanding officer acted with a culpable state of mind or displayed a deliberate indifference to health and safety; and (3) use of the Brig's grievance system without filing a petition under Article 138, UCMJ, was insufficient to exhaust administrative remedies. *Id.* at *4–6.

In *Green* we next analyzed the First and Fifth Amendment claims using the four factors from *Turner*[37] and rejected the claims as meritless. *Id.* at *7–12. Regarding the first factor, we found the policy was reasonably related to legitimate penological interests of protecting children and limited to a defined segment of the prison population—"convicted sex offenders." *Id.* at *9–10. We found the second factor—an available alternative means of exercising the right—was "not an important factor" and that "any alternative would only serve to undermine the rule and degrade the protections the rule provides." *Id.* at *11. We weighed the third factor—the impact of exercising the right—against the appellant concluding that "the impact on the prison staff of investigating possible abuses would be unmanageable." *Id.* Regarding the fourth factor—obvious, easy alternatives—we determined that none existed and none were suggested. *Id.* at *11–12.

---

[34] U.S. CONST. amend. I.

[35] U.S. CONST. amend. V.

[36] We also addressed the policy in *United States v. Frantz*, No. ACM 39657, 2020 CCA LEXIS 404, at *47–53 (A.F. Ct. Crim. App. 10 Nov. 2020) (unpub. op.), *aff'd,* No. 21-0146, 2021 CAAF LEXIS 744 (C.A.A.F. 10 Aug. 2021). In *Frantz*, we granted no relief after analyzing how the appellant's complaints about the Miramar Brig policy should be addressed as they were not contained in his court-martial record but were only raised in declarations on appeal. *Id.* at *52.

[37] Our analysis of the second, third, and fourth factors in *Green* relied on *Beard v. Banks*, a case where the Supreme Court noted that the "second, third, and fourth factors, being in a sense logically related to the [challenged policy] itself; [added] little, one way or another, to the first factor's basic logical rationale." 548 U.S. 521, 532 (2006); *Green*, unpub. op. at *8–12. We note that *Banks* was reviewed by the Third Circuit and then the Supreme Court after entry of summary judgment in favor of the Secretary of the Pennsylvania Department of Corrections.

More recently than *Green*, our sister-service courts have examined minor-contact policies for convicted sex offenders confined in military prisons. *United States v. Jacinto*, 79 M.J. 870 (N.M. Ct. Crim. App. 2020), *rev'd on other grounds*, ___ M.J. ___, No. 20–0359, 2021 CAAF LEXIS 686 (C.A.A.F. 15 Jul. 2021); *United States v. Guinn*, ARMY 20170500, 2019 CCA LEXIS 143 (A. Ct. Crim. App. 28 Mar. 2019) (unpub. op.), *rev'd*, ___ M.J. ___, No. 19-0384, 2021 CAAF LEXIS 439 (C.A.A.F. 10 May 2021); *United States v. Jessie*, ARMY 20160187, 2018 CCA LEXIS 609 (A. Ct. Crim. App. 28 Dec. 2018) (en banc) (unpub. op.), *aff'd*, 79 M.J. 437 (C.A.A.F. 2020). *Jacinto* is of particular interest as it involved the same Naval Consolidated Brig Miramar's minor contact policy as is before us. *See* 79 M.J. at 890. Our sister-service court said this about the policy:

> At first blush, the Brig policy appears to be arbitrary and tailored solely for the administrative convenience of the Brig rather than to address any specific valid concern over prisoner or guard safety, child safety, or maintaining good order and discipline. The problem is we only have a first blush and not a complete picture.

*Id.* The court then found the appellant had not sought administrative relief at the prison or filed a petition under Article 138, UCMJ, and resolved the issue in the Government's favor. *Id.* at 890–91.

Turning to the recent Army Court of Criminal Appeals decisions in *Guinn* and *Jessie*, we note that there were dissenting opinions filed which concluded a First Amendment violation occurred with a slightly different minor-contact policy at a different military confinement facility. *See Guinn*, unpub. op. at *12 (Schasberger, J., dissenting); *Jessie*, unpub. op. at *25 (Schasberger, J., dissenting), *38 (Hagler, J., dissenting). The CAAF reversed and remanded in *Guinn* so the Army Court of Criminal Appeals will consider the constitutional claims as part of their Article 66, UCMJ, review. We acknowledge the differences between our unpublished decision in *Green* and the more recent comments from some judges on our sister-service courts regarding the minor-contact policies in some military confinement facilities. We need not resolve those differences to decide Appellant's case, so we decline to do so.

In Appellant's case, the record before us on this issue is far from clear. We can determine that (1) Appellant was denied direct and indirect contact with his three minor children from 20 August 2018 until sometime in February 2019; (2) SK filed a few email inquiries and one written request to permit contact during the time period of 27 August 2018 and 7 November 2018; (3) Appellant's civilian defense counsel filed one written request on the issue of minor contact on 13 November 2018; and (4) Appellant raised this issue to the con-

vening authority in his 20 November 2018 clemency submission. There is nothing before us to suggest Appellant used the Miramar Brig's prisoner grievance system or that he filed a petition under Article 138, UCMJ, to the commander who ordered him into post-trial confinement.

Additionally, Appellant has not provided us a single written request that he filed with the Miramar Brig to contact his children. Without such a request, we cannot determine whether he complied with the reasonable administrative requirements of the policy. It is Appellant's burden to provide a clear record to us to show how this policy was unconstitutionally applied to him. What he has provided us is insufficient. We also note that the record before us does not demonstrate whether the 11 January 2016 policy of the Miramar Brig remained in effect through the entire period when Appellant was not allowed to contact his children.[38] We can conclude from the record before us that it was in effect from 20 August 2018 until 20 November 2018. For purposes of the remainder of our analysis, we assumed it remained in effect until at least the end of February 2019.

We conclude that Appellant failed to exhaust his administrative remedies before he sought our review of this issue. Upon raising this issue for our review he failed to provide us a clear record demonstrating the legal deficiency in the administration of this policy. Under *Guinn*, Appellant "must establish" a record demonstrating exhaustion of administrative remedies, a clear record demonstrating the jurisdictional basis for our action, and a clear record demonstrating the legal deficiency in the administration of the prisoner. 2021 CAAF LEXIS 439 at *18–19. Appellant has only shown the jurisdictional basis for our action and has failed to establish the other two requirements.

Therefore, we do not need to assess the four *Turner* factors before deciding that Appellant's constitutional claims, as raised before us, must fail. Similarly, Appellant's claim that his approved sentence was unlawfully increased due to the minor-contact policy warrants no further discussion or relief. However, our decision in this case should not be interpreted as an endorsement of the Naval

---

[38] *Jessie* involved the minor contact policy used by the Joint Regional Confinement Facility (JRCF) at Fort Leavenworth, Kansas, which was codified in JRCF Regulation 600–1 and Military Correctional Complex Standard Operating Procedure (MCC SOP) 310. Unpub. op. at *4–5. This minor contact policy was amended on 7 November 2018 "to allow prisoner contact with children under certain conditions and after an individualized assessment." Unpub. op. at *5. *Guinn* also involved the JRCF's minor contact policy as codified in MCC SOP 310. Unpub. op. at *4. The minor contact policy before us appears to be somewhat different given the Army Court of Criminal Appeals' descriptions of MCC SOP 310 in *Jessie* and *Guinn*.

Consolidated Brig Miramar's 11 January 2016 policy limiting direct and indirect contact to minors of certain incarcerated persons.

### c. Denial of Medications

We do not see where Appellant raised the issue of denial of medications in his clemency submission. Appellant has not cited to any particular portion of the record in his reply brief. However, under *Jessie* we may still consider materials outside the record in the context of Eighth Amendment and Article 55, UCMJ, claims even without the issue being raised during clemency such that it is in the "entire record." *See* 79 M.J. at 445.

Turning to the merits, there are no grievances filed with either prison system in the record before us and no petition for relief under Article 138, UCMJ. Therefore, we conclude that there is no Eighth Amendment or Article 55, UCMJ, violation based on the record before us. Appellant has failed to show a culpable state of mind on behalf of prison officials that amounted to deliberate indifference to his health and safety when he did not receive prescribed medications. *See Lovett*, 63 M.J. at 215. He also failed to exhaust the administrative remedies available to him. *Id.*

Finally, Appellant requests we consider the same affidavits we considered to resolve Appellant's claim under the Eighth Amendment and Article 55, UCMJ, to determine whether sentence relief is warranted. Appellant did not raise this issue during clemency and has only cited outside-the-record declarations. The CAAF has recently held that under the plain language of Article 66(c), UCMJ, and its decision in *Jessie*, 79 M.J. 437, we have no authority to consider such outside-the-record declarations to determine sentence appropriateness even when we have already considered them to resolve Eighth Amendment and Article 55, UCMJ, claims. *See United States v. Willman*, ___ M.J. ___, No. 20-0030, 2021 CAAF LEXIS 697, at *8, 10–15 (C.A.A.F. 21 Jul. 2021).

### d. Conclusion

We also considered whether the combined effect of those post-trial conditions raised within the entire record of trial would warrant relief under our Article 66(c), UCMJ authority. We conclude that relief is not warranted.

## I. Waiver of Mandatory Forfeitures

### 1. Additional Background

On 6 August 2018, Appellant, through counsel, requested that the convening authority defer all mandatory forfeitures until action and then waive them for six months and direct they be paid to SK for her benefit and the benefit of their three minor children. JK, who was now 19 years old, was not mentioned in Appellant's request. On 14 August 2018, the convening authority deferred all mandatory forfeitures from 15 August 2018 until the date of action.

On 20 August 2018, JK, through her special victims' counsel, also requested that the convening authority waive the mandatory forfeitures. But, JK requested the waived forfeitures be paid to her, solely for her benefit. At the time of Appellant's sentencing, JK was in her second year of college and was engaged to be married.

On 9 November 2018, the staff judge advocate's recommendation (SJAR) was signed. It indicated that JK qualified as a dependent and was eligible to receive waived forfeitures.

On 20 November 2018, Appellant's clemency request reasserted his request for a waiver of mandatory forfeitures "for the benefit of [his] dependents." Appellant did not mention JK's request for the waived forfeitures and did not address whether JK was still his dependent. On 26 November 2018, the convening authority waived the mandatory forfeitures for six months and directed they "be paid to [JK], the dependent child of the accused, for the benefit of herself."

Before us, Appellant argues that JK did not qualify as his dependent because she no longer relied upon him for financial support and because she would lose dependent status upon her marriage. Alternatively, Appellant argues the convening authority lacked the discretion under Article 58b(b), UCMJ, 10 U.S.C. § 858b(b), to apportion payments of waived forfeitures among dependents. Appellant argues the plain language and grammatical posture of Article 58b(b) both support his position and that Congress could have drafted the statute differently, but did not.

The Government argues JK was still Appellant's dependent at the time of waiver because she had neither attained the age of 21 nor married CH. In support of its argument, the Government cites 37 U.S.C. § 401 for the definition of who is a dependent of a military member. The Government also notes that whether a military member provides financial support to a dependent or not does not matter under that statute. The Government argues that Article 58b(b), UCMJ, vested the convening authority with discretionary authority to apportion monetary amounts for waived forfeiture payments among dependents. In response to Appellant's statutory construction argument, the Government asserts: "[G]iven that Congress intended this provision to be for the benefit of dependents, and as it may be done even without the request of an accused, an appropriate reading of Article 58b is that the convening authority may direct the person who will receive the benefit of the forfeitures."

### 2. Law

This Court reviews questions of statutory interpretation de novo. *United States v. Lopez de Victoria*, 66 M.J. 67, 73 (C.A.A.F. 2008) (citation omitted). "[T]he term 'dependent', with respect to a member of a uniformed service,

means. . . [a]n unmarried child of the member who . . . is under 21 years of age." 37 U.S.C. § 401(a)(2)(A).

"[I]t is axiomatic that [i]n determining the scope of a statute, we look first to its language." *United States v. Murphy*, 74 M.J. 302, 305 (C.A.A.F. 2015) (alterations in original) (internal quotation marks omitted) (quoting *United States v. Kearns*, 73 M.J. 177, 181 (C.A.A.F. 2014)). "Unless ambiguous, the plain language of a statute will control unless it leads to an absurd result." *United States v. King*, 71 M.J. 50, 52 (C.A.A.F. 2012) (citation omitted). "Whether the statutory language is ambiguous is determined 'by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. McPherson*, 73 M.J. 393, 395 (C.A.A.F. 2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

Article 58b(b), UCMJ, reads

> In a case involving an accused who has dependents, the convening authority . . . may waive any or all of the forfeitures of pay and allowances required by subsection (a) for a period not to exceed six months. Any amount of pay or allowances that, except for a waiver under this subsection, would be forfeited shall be paid, as the convening authority . . . directs, to the dependents of the accused.

10 U.S.C. § 858b(b).

R.C.M. 1101(d)(2) lists factors that may be considered by the convening authority in determining the amount of forfeitures, if any, to be waived, including but not limited to: "the length of . . . confinement, the number and age(s) of the [ ] family members, whether the accused requested waiver, any debts owed by the accused, the ability of the accused's family members to find employment, and the availability of transitional compensation for abused dependents permitted under 10 U.S.C. § 1059."

"The exercise of a convening authority's discretion to waive mandatory forfeitures under Article 58b(b), UCMJ, is a matter of clemency under Article 60(c), UCMJ, 10 U.S.C. § 860(c), and thus not subject to judicial review." *United States v. Edwards*, 77 M.J. 668, 670 (A.F. Ct. Crim. App. 2018) (citation omitted). The convening authority is "not required to provide a written rationale" for a denial of an appellant's request for waiver of mandatory forfeitures. *Id.*

### 3. Analysis

At the time of Appellant's sentencing, JK was Appellant's dependent. She was an "unmarried child" of Appellant "under 21 years of age." *See* 37 U.S.C.

§ 401. The total number of dependents on Appellant's personal data sheet admitted at trial confirmed this as it showed five dependents which would include SK, JK, and the other three minor children. JK's engagement to CH does not matter to a dependency determination under the plain language of 37 U.S.C. § 401. Whether Appellant provided JK financial support, or not, is also unimportant to the dependency determination. Appellant has made no claim that JK married CH, or anyone else, after trial but before the convening authority's waiver decision. Appellant has also not claimed that JK married during the time period where she would have received the waived forfeitures, or that she reached 21 years of age. Based on the record before us, we conclude the convening authority could legally waive mandatory forfeitures for JK's benefit because she was Appellant's dependent.

We next address whether the convening authority was required to waive the forfeitures for the benefit of Appellant's five dependents, rather than just JK, based on the statutory language of Article 58b(b). Appellant is correct that the plain language of the statute does not explicitly state that the convening authority may pick a single dependent among many to receive waived forfeitures. But the statute need not be so specific. Rather, the question is whether the statute authorized the convening authority to direct the waived forfeitures to be paid as he did. We see no prohibition in the plain language of the statute.

In support of his interpretation, Appellant argues that we should read the phrase "as the convening authority . . . directs" to only give the convening authority discretion on the total amount of pay and/or allowances to be paid. Appellant also argues we should read the phrase "to the dependents of the accused" to mean "any and all dependents." We are not persuaded by Appellant's interpretations.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Kelly*, 77 M.J. 404, 406 (C.A.A.F. 2018) (citation omitted). Therefore, our court "typically seeks to harmonize independent provisions of a statute." *Id*. at 407. As we read Article 58b(b) in context and harmonizing its independent provisions, the convening authority has discretion to direct the payment of waived mandatory forfeitures, but only to "the dependents of the accused" meaning the convening authority cannot direct payment to a non-dependent.

To read Article 58b(b), UCMJ, differently would also lead to absurd results in certain cases. It would not allow a convening authority to differentiate between a dependent who lived in one household under extreme financial strain and another dependent in a different household with no financial issues. It

would not permit the convening authority to differentiate between one dependent who was a co-actor in a convicted offense and another dependent who was a victim of a convicted offense.

R.C.M. 1101(d)(2), its Discussion, and the Drafter's Analysis are each consistent with our reading of Article 58b(b), UCMJ, and the phrase "the dependents of the accused." R.C.M. 1101(d)(1) permits the waiver "for a period not to exceed six months, all or part of the forfeitures for the purpose of providing support to the accused's dependent(s)." The Discussion reads, "The waived forfeitures are paid as support to dependent(s) *designated* by the convening authority." R.C.M. 1101(d), Discussion (emphasis added). Finally, the Drafters' Analysis to R.C.M. 1101(d) describes the "purpose of such waiver is to provide support to *some or all* of the accused's dependent(s)." *MCM*, App. 21, at A21-82 (emphasis added).

Given the purpose and context of Article 58b(b), UCMJ, we conclude the convening authority had the discretion to decide that JK alone would receive the benefit of the waiver of the mandatory forfeitures of pay and allowances. Based on the record before us, the statutory limits on the convening authority's discretion do not apply as JK was Appellant's dependent and the waiver was directed for a period of six months.

## J. Timeliness of Appellate Review

Although not raised by Appellant, we consider the issue of timely appellate review. We examine the circumstances of the delay and determine if Appellant suffered prejudice in our analysis.

### 1. Law

Whether an appellant has been deprived of his due process right to timely appellate review is a question of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed with a CCA. *Moreno*, 63 M.J. at 142. If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of ability to present a defense at a rehearing. *Id*. at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(c), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

### 2. Analysis

Appellant's case was docketed with our court on 12 December 2018. The overall delay in failing to render this decision by 12 June 2020 is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine there has been no violation of Appellant's right to due process and a speedy appellate review.

Analyzing the *Barker* factors, we find the delay is long, but not excessively so given the nature of this case and appeal. After docketing, we granted 14 enlargements of time to Appellant before he filed his assignments of error brief and the issues he personally raised pursuant to *Grostefon*. During this time we conducted three status conferences with the parties. These occurred after we received Appellant's motions for his seventh, tenth, and thirteenth enlargements of time. In granting Appellant's seventh request, we noted that Appellant was aware of the progress on his appeal and of his options with assigned counsel, and that he consented to the motion for enlargement of time in the interests of having his case thoroughly briefed. In granting Appellant's tenth and thirteenth requests, we noted that Appellant consented to the requests and was aware of his rights to counsel and to timely appellate review.

We granted one enlargement of time for the Government to file its answer brief and to incorporate the declarations we ordered regarding the ineffective assistance of counsel claims. Appellant was granted an enlargement of time to file his reply brief. Once the reply brief was submitted, we granted motions for the Government and Appellant to file responses, which both parties did. The filings were complete on 7 July 2020, and the 18-month period for timely appellate review had already passed.

Appellant and his counsel identified a total of 17 issues, some of which alleged multiple legal errors, to which we applied our careful attention. The record of trial in this case is 24 volumes, the transcript was more than 2,300 pages long, and there were 130 appellate exhibits. The appellate filings in this case occupy two additional volumes.

We find the length of the delay weighs in Appellant's favor. We find the reasons for the delay weigh in the Government's favor. Much of the delay is attributable to the length of time it took for the appellate filings to be complete. The remainder was necessary for our court to fulfill its Article 66, UCMJ, responsibilities. Appellant has not asserted his right to speedy appellate review. He also has not pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. *See Toohey*, 63 M.J. at 362. As a result, there is no due process violation. *See id.*

In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review does not warrant relief.

## K. Sentence Reassessment

Given our decision to set aside and dismiss Charge II and its Specification with prejudice, we must consider whether we can reassess the sentence. We have "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 13 (C.A.A.F. 2013) (citation omitted). Our superior court has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error . . . ." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). The CAAF has identified the following non-exclusive factors to "assist" in such an analysis:

> (1) Dramatic changes in the penalty landscape and exposure.
>
> (2) Whether an appellant chose sentencing by members or a military judge alone. . . .
>
> (3) Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.

(4) Whether the remaining offenses are of the type that judges of the [CCAs] should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial.

*Winckelmann*, 73 M.J. at 15–16 (citations omitted).

We find the factors weigh in favor of reassessment rather than rehearing. Once Appellant was convicted of both offenses, the military judge found the charges and their specifications were unreasonably multiplied for the purposes of sentencing and merged them. The military judge instructed the court members the offenses were "one offense for sentencing purposes," and they "must consider them as one offense." Court members are "presumed to follow instructions, until demonstrated otherwise," and so we conclude the court members treated the offenses as one. *See Washington*, 57 M.J. at 403. As the offenses were treated as one, there is no change in the penalty landscape or exposure. While the forum was officer members instead of military judge alone this is the only factor that we weigh in favor of a rehearing. The nature of the Article 120, UCMJ, offense captures the gravamen of criminal conduct at issue in this case, a non-consensual sexual act committed against JK. We see little, if any, change in the admissible evidence and its relevance. We also discern no change in the matters that JK presented under R.C.M. 1001A. Finally, the appellate judges on our court have experience with Article 120, UCMJ, offenses such that we can reliably determine what sentence would have been imposed at trial.

Weighing the *Winckelmann* factors together, recognizing that they are "illustrative" and not "dispositive," and considering the totality of the circumstances, we conclude that such a sentence would have included a dismissal and confinement for three years.

### III. CONCLUSION

The findings of guilt of Charge II and its Specification are **SET ASIDE** and Charge II and its Specification are **DISMISSED WITH PREJUDICE**. We reassess the sentence to a dismissal and confinement for three years. The remaining findings and the sentence as reassessed are correct in law and fact,

and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court